# United States Court of Appeals
# For the Second Circuit

August Term 2022

Argued *en banc*: June 6, 2023
Decided: December 15, 2023

No. 21-1365

SELINA SOULE, A MINOR, BY BIANCA STANESCU, HER MOTHER; CHELSEA MITCHELL, A MINOR, BY CHRISTINA MITCHELL, HER MOTHER; ALANNA SMITH, A MINOR, BY CHERYL RADACHOWSKY, HER MOTHER; ASHLEY NICOLETTI, A MINOR, BY JENNIFER NICOLETTI, HER MOTHER,

*Plaintiffs-Appellants,*

*v.*

CONNECTICUT ASSOCIATION OF SCHOOLS, INC. D/B/A CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION,

*Defendants-Appellees,*

ANDRAYA YEARWOOD; THANIA EDWARDS, ON BEHALF OF HER DAUGHTER, T.M.; COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES,

*Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the District of Connecticut
No. 20-cv-201, Robert N. Chatigny, *Judge*.

Before:    LIVINGSTON, *Chief Judge*, CHIN, LOHIER, CARNEY, SULLIVAN, BIANCO, PARK, NARDINI, MENASHI, LEE, ROBINSON, PÉREZ, NATHAN, MERRIAM, and KAHN, *Circuit Judges*.*

NATHAN, *J.*, filed the majority opinion in which LIVINGSTON, *C.J.*, SULLIVAN, BIANCO, PARK, NARDINI, and MENASHI, *JJ.*, joined in full, LOHIER and ROBINSON, *JJ.*, joined as to Part I, LEE and PÉREZ, *JJ.*, joined as to Parts I.A, I.B.1, and II, and MERRIAM, *J.*, joined as to Part II.

PARK, *J.*, filed a concurring opinion in which NARDINI and MENASHI, *JJ.*, joined.

MENASHI, *J.*, filed a concurring opinion in which PARK, *J.*, joined.

NATHAN, *J.*, filed a concurring opinion in which ROBINSON, *J.*, joined.

LOHIER, *J.*, filed an opinion concurring in part and dissenting in part.

PÉREZ, *J.*, filed an opinion concurring in part and dissenting in part.

MERRIAM, *J.*, filed an opinion concurring in part and dissenting in part.

CHIN, *J.*, filed a dissenting opinion in which CARNEY and KAHN, *JJ.*, joined in full, MERRIAM, *J.*, joined as to Parts I and II, LEE and PÉREZ,

---

* Judge Chin and Judge Carney, who are senior judges, participated in this rehearing *en banc* pursuant to 28 U.S.C. § 46(c)(1) and 28 U.S.C. § 294(c).

*JJ.*, joined as to Part II, and LOHIER and ROBINSON, *JJ.*, joined as to Part III.

———

An athletic conference permits Connecticut high school students to participate on athletic teams consistent with the gender identity established in their school records. Four non-transgender female track and field athletes sued the conference and member school districts, alleging that allowing transgender girls to participate in girls' track and field deprives them of equal athletic opportunity in violation of Title IX. Two transgender female athletes intervened.

We do not consider whether Plaintiffs' Title IX claims have any merit or whether they would be entitled to the relief that they seek as a matter of equity, but rather whether the district court has jurisdiction to hear their claims in the first instance. We conclude that it does, for the reasons advocated for both by Plaintiffs and by Intervenors. First, Plaintiffs have established Article III standing at this stage in the litigation. They have pled a concrete, particularized, and actual injury in fact that is plausibly redressable by monetary damages and an injunction ordering Defendants to alter certain athletic records. Second, the district court was not required to determine whether Defendants had adequate notice of a Title IX violation to be liable for monetary damages before reaching the merits of Plaintiffs' Title IX claims. Accordingly, we **VACATE** and **REMAND** for further proceedings.

———

JOHN J. BURSCH (Christiana M. Kiefer, Roger G. Brooks, Cody S. Barnett, Rory T. Gray, *on the brief*), Alliance Defending Freedom, Washington, DC, *for Plaintiffs-Appellants*.

PETER J. MURPHY (Linda L. Yoder, *on the brief*), Shipman & Goodwin LLP, Hartford, CT, *for Defendants-Appellees Connecticut Association of Schools, Inc. d/b/a Connecticut Interscholastic Athletic Conference; Danbury Public Schools Board of Education*.

Johanna G. Zelman, FordHarrison, LLP, Hartford, CT, *for Defendants-Appellees Bloomfield Public Schools Board of Education; Cromwell Public Schools Board of Education*.

David S. Monastersky, Howd & Ludorf, LLC, Hartford, CT, *for Defendants-Appellees Glastonbury Public Schools Board of Education; Canton Public Schools Board of Education*.

JOSHUA A. BLOCK (Ria Tabacco Mar, Elana Bildner, Dan Barrett, *on the brief*), ACLU Foundation, New York, NY, *for Intervenor-Defendants-Appellees Andraya Yearwood; Thania Edwards, on behalf of her daughter, T.M.*

Michael E. Roberts, Commission on Human Rights and Opportunities, Hartford, CT, *for Intervenor-Defendant-Appellee Commission on Human Rights and Opportunities*.

————

NATHAN, *Circuit Judge*:

Ten years ago, the conference governing interscholastic sports in Connecticut made the decision to permit high school students to participate in school-sponsored athletics consistent with the gender identity established in their school records. This case arose when Plaintiffs, a group of non-transgender girls, challenged that policy in federal court, alleging that it violates Title IX, which

4

prohibits sex discrimination in education. To remedy their alleged injury, Plaintiffs seek monetary damages from the athletic conference and its member school districts, whom they named as Defendants. They also seek an injunction requiring Defendants to alter certain athletic records by removing times of transgender girls and reranking titles and placements of non-transgender girls.

Whether Plaintiffs' Title IX claims have any merit is not before us today. Nor is Plaintiffs' ultimate entitlement to a remedy. We consider only whether Plaintiffs have standing to sue and whether they can, at this stage, seek monetary damages. Although the specific issues before us are narrow and our decision very limited in scope, questions of standing and the availability of monetary damages have broad implications for all manner of civil rights litigation and civil rights plaintiffs. Precedent and principle require that we proceed cautiously before limiting access to courts and remedies.

At core, we conclude that the case should return to the district court for consideration in the first instance of whether Plaintiffs have plausibly stated a claim under Title IX. In doing so, we adopt the outcome advocated for on appeal

5

both by Plaintiffs and by Intervenors, the transgender girls against whom they competed. More specifically, we conclude that further proceedings in the district court are required for two reasons.

First, we hold that Plaintiffs have pled facts sufficient to establish Article III standing at this stage in the litigation. Plaintiffs all personally competed in high school track in Connecticut, and they all identified instances in which they raced against and finished behind one or both Intervenors. Plaintiffs allege—and we must assume—that but for Intervenors' participation in these specific races, they would have placed higher. For the purposes of the standing inquiry, we must also assume that Plaintiffs are correct that allowing Intervenors to compete in those races violated Title IX. With these assumptions in mind, we conclude that Plaintiffs adequately pled a concrete, particularized, and actual injury in fact: the alleged denial of equal athletic opportunity and concomitant loss of publicly recognized titles and placements during track and field competitions in which they participated against and finished behind Intervenors. On the issue of

6

whether Plaintiffs have plausibly stated an injury in fact, all members of the *en banc* Court agree unanimously that they have.

We further conclude that the alleged injury is plausibly redressable by monetary and injunctive relief. To be sure, no injunction could change the way past races were run. Moreover, ordering Defendants to alter private records or records that do not personally pertain to and impact Plaintiffs would provide Plaintiffs with at most psychic satisfaction, which is not an acceptable Article III remedy. But Plaintiffs plausibly allege that directing Defendants to alter public athletic records related to the particularized injury they allege could at least provide Plaintiffs with the publicly recognized titles and placements they would have received if Intervenors had not competed and finished ahead of Plaintiffs in specific races.

The same would be true if the facts were reversed and an athletic conference decided to categorize transgender girl athletes as boys. If transgender girls alleged that such a policy discriminated against them on the basis of sex and deprived them of publicly recognized titles and placements, they too would have standing

7

to bring a Title IX claim. And they too could seek an injunction altering the existing public records to accurately reflect their alleged athletic achievement. Similarly, Intervenors have an ongoing interest in litigating *against* any alteration to their public athletic records. The legally cognizable interest Intervenors have in protecting the records of their athletic achievements, including times and placements in races they have run, is materially indistinguishable from the interest Plaintiffs assert.

Defendants argue that an injunction to alter the relevant records would not be fair or appropriate. That may be. But our precedent establishes that the fairness, justice, and novelty of a remedy are equitable considerations that the district court would need to evaluate when exercising its discretion to fashion appropriate injunctive relief, not factors for determining Article III standing.

The second reason for remand to the district court concerns whether Plaintiffs have a private right of action to monetary damages, under a framework originating from the Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). Because Congress enacted Title IX pursuant to its

Spending Clause power, the statute operates like a contract: in exchange for federal funds, educational institutions agree to comply with Title IX and its implementing regulations. In keeping with the contractual nature of this bargain, if an institution lacked notice of a Title IX violation, private parties generally cannot recover monetary damages for the violation. We do not resolve today whether Plaintiffs or Defendants are correct as to the availability of monetary damages in this case. Rather, consistent with the view espoused by Intervenors, there is good reason here to consider the merits of Plaintiffs' Title IX claims before or in tandem with the question of notice. Courts typically have not analyzed notice as a freestanding issue before reaching the merits of a Title IX claim, and understandably so. The parties here dispute whether, in order to recover monetary damages, Plaintiffs can establish there was adequate notice that allowing transgender girls to compete in girls' sports violated Title IX. This question is difficult to answer without first considering whether allowing transgender girls to compete in girls' sports even violates Title IX to begin with. Yet the district court concluded that it was *required* to resolve the theoretical

availability of monetary damages before reaching the merits of Plaintiffs' Title IX claims. That was error. On remand, we direct the district court to reach the merits before or in tandem with the question of notice.

Accordingly, we **VACATE** the judgment of the district court and **REMAND** for further proceedings. On remand, the district court[1] should assess in the first instance whether Plaintiffs' complaint states a claim for a violation of Title IX.

## BACKGROUND

### I. Factual Allegations[2]

For the past decade, the Connecticut Interscholastic Athletic Conference (CIAC), a nonprofit organization that governs interscholastic sports in Connecticut, has applied a policy permitting high school students to participate on athletic teams consistent with their established gender identity (the CIAC Policy). The CIAC Policy directs member school districts to determine students'

---

[1] In their brief before the three-judge panel of this Court, Plaintiffs requested that the case be reassigned to a different district court judge upon remand. We deny that request.

[2] The factual allegations are taken from Plaintiffs' second amended complaint and any incorporated documents, and they are assumed to be true at this stage. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

eligibility to participate on teams "based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." CIAC By-Laws Article IX, Section B. Students are "not . . . permitted to participate in practices or to try out for gender specific sports teams that are different from their publicly identified gender identity at that time or to try out simultaneously for CIAC sports teams of both genders." *Id.*

Plaintiffs Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti are four non-transgender female athletes who competed in high school track in Connecticut. During the 2017, 2018, and 2019 track seasons, Plaintiffs competed in CIAC-sponsored events against two transgender female athletes, Andraya Yearwood and Terry Miller, who are Intervenors in this case. In some but not all races, Intervenors finished ahead of Plaintiffs. For example, in the 2019 state open indoor 55m final, Plaintiff Mitchell finished in 3rd place behind Intervenors Miller and Yearwood. For each Plaintiff, the complaint identifies at least one race in which she allegedly competed against and lost to one or both Intervenors. The

complaint further alleges that at times, Intervenor Miller's and Intervenor Yearwood's results meant that they qualified for the next level of competition and certain Plaintiffs did not. For example, Plaintiff Soule finished 8th in the 2019 state open indoor 55m preliminary race, losing to both Intervenors Miller and Yearwood, who took 1st and 2nd place. The complaint alleges that if Intervenors Miller and Yearwood had not competed in that race, Plaintiff Soule would have qualified for the regional championship.

In Plaintiffs' view, the CIAC Policy of allowing participation consistent with an individual's established gender identity discriminated against them by requiring Plaintiffs to compete against transgender girls, who Plaintiffs allege have a "physiological athletic advantage." App'x 140. Plaintiffs claim that by putting them at this alleged competitive disadvantage, the CIAC Policy violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, which prohibits sex discrimination in education by institutions that receive federal financial assistance.

## II. Procedural History

Beginning in 2018, Plaintiffs and their parents complained to CIAC officials and their respective schools, alleging that the CIAC Policy denied them fair and equal competitive opportunities and the publicly recognized titles and placements they deserved. Defendants continued to enforce the CIAC Policy. In June 2019, Plaintiffs filed a Title IX complaint with U.S. Department of Education's Office for Civil Rights, which launched a formal investigation. As the spring 2020 track season approached, Plaintiffs turned to federal court to attempt to prevent Intervenors Yearwood and Miller from competing consistent with their established gender identity as girls.

In February 2020, Plaintiffs commenced this action in the District of Connecticut against the CIAC and several of its member school districts. Plaintiffs principally sought (1) a declaration that Defendants violated Title IX; (2) an injunction prohibiting Defendants from enforcing the CIAC Policy; (3) an injunction requiring Defendants to "correct" their official athletic records by giving "female athletes" the "credit and/or titles" they "would have

received . . . but for the participation" of transgender girls in "elite competitions designated for girls or women"; (4) an injunction requiring Defendants to further "correct" the records by "remov[ing]" transgender girls from the records for those competitions and "remov[ing] times achieved" by transgender girls "from any records purporting to record times achieved by girls or women"; (5) nominal and compensatory damages; and (6) attorneys' fees and expenses under 42 U.S.C. § 1988. App'x 175–76 (Second Amended Complaint). The district court allowed Yearwood, Miller, and the Connecticut Commission on Human Rights and Opportunities to intervene as Intervenor-Defendants.

Soon after the case commenced, the COVID-19 pandemic broke out, causing all spring track events to be cancelled. In August 2020, Defendants moved to dismiss the operative complaint for lack of subject-matter jurisdiction and for failure to state a claim on which relief could be granted, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

In April 2021, the district court granted Defendants' motion to dismiss. *See Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, No. 20-cv-201, 2021 WL 1617206

14

(D. Conn. Apr. 25, 2021). First, the district court found that Plaintiffs' request for an injunction prohibiting Defendants from enforcing the CIAC Policy going forward was moot. By that time, Plaintiffs Soule and Miller and both Intervenors had all graduated from high school. Plaintiffs Smith and Nicoletti had not yet graduated, but they could not identify any transgender student against whom they were likely to compete. Second, the district court dismissed Plaintiffs' request for an injunction requiring Defendants to "revise" their athletic records, reasoning that Plaintiffs failed to establish the redressability element of standing for that form of relief. *Id.* at *7. Finally, the district court held that Plaintiffs' claims for monetary damages were barred because under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), "monetary relief is available in private suits under Title IX only if the defendant received adequate notice that it could be liable for the conduct at issue" and Defendants "did not receive the requisite notice." *Soule*, No. 20-cv-201, 2021 WL 1617206, at *8. Though Plaintiffs argued that "the question of notice should be deferred until a later stage of the case," the district court determined that doing so would be improper. *Id.* at *8 n.13. It reasoned that if

15

monetary damages were barred under *Pennhurst*, "the action is subject to dismissal in its entirety because the only remaining form of relief sought in this case . . . is insufficient, standing alone, to sustain jurisdiction." *Id.* (quotation marks omitted). The district court did not reach the merits question of whether Plaintiffs plausibly allege a violation of Title IX.

Plaintiffs timely appealed to the Second Circuit. On December 16, 2022, a panel affirmed the judgment of the district court. *Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43 (2d Cir. 2022). Plaintiffs conceded that their claim for injunctive relief barring enforcement of the CIAC Policy going forward was moot. As for the remaining claims, the panel held that Plaintiffs lacked standing to seek an injunction "rewriting the records" because they failed to establish a redressable injury in fact, and that their claim for monetary damages was barred under *Pennhurst*. *Id.* at 50–56. Like the district court, the three-judge panel did not reach the merits question of whether Plaintiffs stated a valid claim under Title IX. In February 2023, the Court ordered that the appeal be reheard *en banc*, limited to the issues of injury in fact, redressability, and *Pennhurst* notice.

16

# DISCUSSION

We review *de novo* a district court's dismissal of a complaint for lack of standing and for failure to state a claim on which relief can be granted. *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173 (2d Cir. 2012). We construe the complaint in Plaintiffs' favor, accepting all material factual allegations as true. *Id.*

The scope of this case has changed since it was before the district court and since it was before the original three-judge panel. Only two live issues remain before us: whether Plaintiffs have Article III standing to sue for the remedies they seek and whether *Pennhurst* bars their claim for monetary damages. For the reasons that follow, we conclude (1) that Plaintiffs have pled facts sufficient to establish standing to seek monetary damages and some of the requested injunctive relief, and (2) that the district court can and should reach the merits of Plaintiffs' Title IX claims before or in tandem with the question of *Pennhurst* notice. Consistent with the outcome on appeal advocated for both by Plaintiffs and by Intervenors, we remand to the district court to consider the merits question in the first instance.

17

## I.  Standing

Article III limits the federal judicial power to deciding "Cases" and "Controversies."  U.S. Const. art. III § 2.  "Under Article III, a case or controversy can exist only if a plaintiff has standing to sue," meaning a personal stake in the outcome of the litigation.  *United States v. Texas*, 143 S. Ct. 1964, 1969 (2023).  This limitation ensures that the judiciary "respects the proper—and properly limited—role of the courts in a democratic society" by refraining from expounding on issues that courts "have no business deciding."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quotation marks omitted).  But courts must equally refrain from narrowing constitutional standing requirements beyond what Article III dictates, lest we needlessly bar plaintiffs with justiciable claims from having their day in court.  Standing is about who may access the courthouse, not about the merits of the claims to be heard once inside.  "[T]he fundamental aspect of standing is its focus on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated" and "[t]he standing issue must therefore

18

be resolved irrespective of the merits of the substantive claims." *United States v. Vazquez*, 145 F.3d 74, 80–81 (2d Cir. 1998) (cleaned up).

As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing Article III standing by showing three elements: (1) that they "suffered an injury in fact," (2) that the injury "is fairly traceable" to Defendants' challenged conduct, and (3) that the injury "is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The "manner and degree of evidence required" to meet this burden depends on the stage of litigation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Id.* Moreover, "[s]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citation omitted).

Defendants contend that Plaintiffs failed to establish the injury in fact and redressability prongs of standing. As set forth below, we disagree.

**A. Injury In Fact**

To constitute an injury in fact sufficient to sustain Article III standing, an alleged harm must be (1) concrete, (2) particularized, and (3) actual or imminent. *TransUnion*, 141 S. Ct. at 2203. To be concrete, an injury must be "real, and not abstract." *Id.* at 2204 (quoting *Spokeo*, 578 U.S. at 340). While traditional tangible harms such as physical and monetary injuries readily qualify as concrete, so do some intangible harms, particularly if they have a "close historical or common-law analogue." *Id.* To be "particularized," an injury "must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quotation marks omitted). Finally, an injury is "actual or imminent" if it has actually happened or is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks omitted).

In this case, Plaintiffs allege that the CIAC Policy deprived them of an opportunity to compete in fair and non-discriminatory high school track races, in violation of Title IX. Moreover, the complaint alleges that Plaintiffs' results in those races were specifically impacted by the CIAC Policy: "each Plaintiff has

20

identified at least one specific instance in which she allegedly raced against—and finished behind—a girl who is transgender." Intervenors' Br. at 28–29. The complaint further alleges that three of the Plaintiffs have additionally identified races in which they would have qualified to advance to the next level of competition if Intervenors had not participated. Intervenors, the transgender athletes who would be impacted by an adverse ruling, agree with Plaintiffs that this suffices to establish injury in fact. So do we.

First, Plaintiffs allege a concrete injury: the denial of "equal athletic opportunities" and loss of publicly recognized titles and placements in track and field competitions, in violation of Title IX. App'x 163. The Supreme Court has identified "discriminatory treatment" as an example of a "concrete, *de facto*, injur[y]." *TransUnion*, 141 S. Ct. at 2205 (quotation marks omitted). In cases involving claims of discriminatory treatment, the alleged harm is frequently twofold: plaintiffs are discriminated against and that discriminatory treatment results in the denial of certain benefits that they would otherwise have enjoyed. Here, Plaintiffs allege that they were denied equal opportunities in track and field

competitions and, as a result, they were also denied the publicly recognized titles and placements that would have flowed from those opportunities. And crucially for Plaintiffs' request for an injunction to alter the records, the alleged impact of the CIAC Policy on Plaintiffs is measurable, not abstract or speculative. Plaintiffs' claim is not that they *might* have won placements and titles if Intervenors had not competed, but rather that they certainly would have. *See Spokeo*, 578 U.S. at 340 ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist." (quoting Black's Law Dictionary 479 (9th ed. 2009))); *see also Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1017–19 (9th Cir. 2002) (finding standing for injunctive relief because plaintiff alleged "a *plausible* causal connection between her academic performance . . . and the alleged discrimination" (emphasis added)). Though a court considering Plaintiffs' claims on the merits might ultimately conclude that competing under the CIAC Policy did not deprive them of equal athletic opportunity and amount to discriminatory treatment under Title IX, standing "in no way depends on the merits of the claim." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (quotation marks omitted).

Second, the alleged injury is particularized because Plaintiffs are athletes who personally competed in CIAC-sponsored events, rather than, for instance, bystanders who simply wish to challenge the CIAC Policy because they disagree with it on principle. *See, e.g.*, *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (holding that an alleged injury related to the scheduling of girls' soccer was "particularized" because plaintiffs were "soccer players who the parties have stipulated would play soccer for their high schools" if the challenged schedule changed). Finally, the injury is actual because it is alleged to have already occurred.

**B. Redressability**

To satisfy the redressability element of Article III standing, a plaintiff must show that it is "likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks omitted). A plaintiff makes this showing when the relief sought "would serve to . . . eliminate any effects of" the alleged legal violation that produced the injury in fact. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105–06 (1998).

23

Plaintiffs must separately establish standing for each form of relief sought. *See TransUnion*, 141 S. Ct. at 2208. Therefore, we address whether Plaintiffs' alleged injury in fact is likely redressable both by monetary damages and by the specific injunctive relief sought in the complaint.[3]

## 1. Monetary Damages

In their prayer for relief, Plaintiffs seek "[a]n award of nominal and compensatory damages and other monetary relief as permitted by law." App'x 176. All parties acknowledge that some form of monetary damages could redress Plaintiffs' alleged injury.[4] Because Plaintiffs' claim is "based on a completed

---

[3] We do not address Plaintiffs' request for an injunction prohibiting Defendants from enforcing the CIAC Policy going forward. As conceded by Plaintiffs at oral argument before the three-judge panel of this Court, that claim is now moot because "all Plaintiffs have graduated from high school and are no longer subject to the Policy." *Soule*, 57 F.4th at 47 n.2; *see Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (holding that "the end of the ice hockey season and the graduation of the last of the plaintiffs render this [Title IX] action moot" because "[n]one of the plaintiffs can benefit from an order requiring equal athletic opportunities for women ice hockey players").

[4] Defendants' brief asserts that "nominal damages may be available in some Title IX cases," but that "they are not available in this particular case by virtue of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)"—in other words, monetary damages are unavailable "[b]ecause the law does not authorize [them]," not because they would fail to redress Plaintiffs' alleged injury. Defendants' Br. at 37. At oral argument, Defendants took the position that Plaintiffs have not alleged "an injury in fact . . . that would be redressable by money damages if money damages are available under *Pennhurst*." Transcript at 40. To the extent that Defendants have changed their position, we reject their view of redressability via monetary damages.

24

violation of a legal right"—their Title IX right to equal athletic opportunity and related loss of publicly recognized titles and placements—"nominal damages provide" at least some "necessary redress." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). So too would compensatory damages, if available, which are definitionally "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001).

## 2. Injunctive Relief to Alter Athletic Records

Plaintiffs' prayer for relief additionally includes two requests for an injunction related to the "correct[ion]" of Defendants' official athletic records:

> (D) An injunction requiring all Defendants to correct any and all records, public or non-public, to remove male athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions designated for girls or women, and conversely to correctly give credit and/or titles to female athletes who would have received such credit and/or titles but for the participation of athletes born male and with male bodies in such competitions;

> (E) An injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by athletes born male and with male bodies from any records purporting to record times achieved by girls or women . . . .

App'x 176.  We conclude that Plaintiffs have standing to seek some, but not all, of this requested injunctive relief.  Specifically, as explained below, we conclude that an injunction could plausibly redress the injury that allegedly resulted from Plaintiffs' loss of publicly recognized titles and placements in specific races at which they competed against and finished behind Intervenors.

Once again, at this stage in the litigation, we must draw all reasonable inferences in favor of Plaintiffs and assess only whether the allegations are sufficient to establish that their requested injunctive relief would theoretically redress the alleged denial of equal athletic opportunity and concomitant loss of publicly recognized titles and placements.  To be sure, no court has the ability to rewind time.  Plaintiffs cannot rerun different races or compete in championships long past.  But Plaintiffs "need not show that a favorable decision will relieve [their] *every* injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original).  Article III only requires that some form of altering the records "would at least partially redress" the alleged injury. *Meese v. Keene*, 481 U.S. 465, 476 (1987).  Here, the complaint alleges that Plaintiffs would have placed higher in several

races but for the participation of Intervenors Yearwood and Miller, who finished before them in those races. In this procedural posture, we must assume Plaintiffs are correct that permitting transgender girls to compete in those races violated federal law and that Plaintiffs' current records are therefore impacted by an unlawful policy. It is plausible that altering certain public athletic records—for example, indicating that Plaintiff Mitchell finished 1st rather than 3rd in the 2019 state open indoor 55m final—would at least partially redress the alleged denial of equal athletic opportunity by giving Plaintiffs the higher placements and titles they would have received without the CIAC Policy in place, albeit belatedly.[5] In other words, it is likely that granting the above-described injunctive relief would "eliminate [some] effects of" the alleged legal violation that produced the injury

---

[5] Nothing in our analysis requires counterfactual imagination about how Plaintiffs would have ranked if the races were rerun. *See* Pérez, J., Concurring Op. at 7. Rather, the injury is theoretically redressable by adjusting final placements and titles in specific races that were *actually* run. The same is true, for example, in cases where athletic records are retroactively altered to account for cheating or doping. Nor does anything in our analysis contemplate that multiple Plaintiffs would place first in some imagined race. *See id.* at 8. For example, Mitchell's record could theoretically be altered to indicate a 1st place finish in the 55m final, whereas Soule's record could theoretically be altered to indicate that she finished 6th in the 55m preliminary race, which would make her a finals qualifier.

in fact, *Steel Co.*, 523 U.S. at 106, because those effects allegedly include loss of publicly recognized titles and placements in specific races that were run—effects that persist even after their high school athletic careers have ended.

The same would be true were the shoe on the other foot. Imagine if some other athletic conference adopts a policy that, unlike the CIAC Policy, categorizes transgender girl athletes as boys in their public records of athletic accomplishment. Under today's holding, if those transgender girls sue alleging a Title IX violation, they would have standing to seek to have those public records altered to indicate their alleged accurate athletic achievement. And by similar logic, the Intervenors have an ongoing interest in litigating *against* any alteration of their public athletic records. *See Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128–29 (2d Cir. 2001) (explaining that to intervene in an action as of right, a party must "show an interest in the action" and "demonstrate that the interest may be impaired by the disposition of the action" (quoting *N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 485 (2d Cir. 1992))); *id.* at 129 (citing Fed. R. Civ. P. 24(a)(2)); *see also* Motion to Intervene at 9–10, *Soule*, No. 20-cv-201 (S.D.N.Y. Feb. 21, 2020), ECF No.

28

36 (Intervenors arguing they satisfied the Rule 24 standard in part because they "have a protectable legal interest . . . in protecting records of their past accomplishments"). The legal interest that underlies Yearwood and Miller's intervention in this case—an interest in protecting *against* after-the-fact revision of the public records of their race times and placements—is materially indistinguishable from the interest Plaintiffs invoke.[6]

The significance of these athletic records may not be apparent to those who do not participate in the world of competitive sports. But say, for example, that a group of plaintiffs challenged a policy that allegedly discriminated against girls in academics by leaving them off the honor roll (or denying Latin honors, *see* Diss. Op. at 18-19). Surely, those plaintiffs would have standing to seek an injunction

---

[6] The dissent's theory of standing for injunctive relief would leave the transgender girl athletes in the above hypothetical without standing to seek alteration of existing athletic records consistent with their athletic achievement. As to the Intervenors, the dissent acknowledges that they have an interest in preventing alteration of their individual records. *See* Diss. Op. at 21 (collecting cases confirming that student athletes have standing to prevent alteration of athletic records). But it asserts that this interest only exists when an athlete faces a future threat of records expungement. *Id.* This approach draws a distinction without a difference. In both cases, student athletes have an interest in the accurate public representation of their athletic achievements—an interest equally threatened by record expungement or inaccurate records from the start. And in both cases, ensuring that public records accurately reflect those achievements provides more than the "psychic satisfaction" derived from "a favorable judgment." *Steel Co.*, 523 U.S. at 107.

to alter their academic records. To many, publicly recognized athletic achievements are just as important as academic ones. Drawing a distinction between the two would import a value judgment into the standing analysis where it does not belong.

Nor does the standing analysis in this case depend on the relevance of the injunctive remedy for obtaining some additional future benefit, such as employment opportunities. *See* Diss. Op. at 13-16. The loss of publicly recognized titles and lower placements in specific races is itself an existing and ongoing effect of Plaintiffs' alleged injury—an effect that would be redressed by public record alterations reflecting those achievements. That one may not deem them valuable is simply not the relevant inquiry for standing purposes. Just as an award of nominal damages partially (even if nominally) remedies the violation of a legal right, injunctive relief can partially (even if nominally) remedy the existing harms that flow from the past denial of equal opportunity alleged in this case. *See Uzuegbunam*, 141 S. Ct. at 801 ("True, a single dollar often cannot provide full

redress, but the ability to effectuate a partial remedy satisfies the redressability requirement." (quotation marks omitted)).

Now, there are several key limitations to our holding on standing. First, Plaintiffs do not have standing to seek remedies for generalized grievances about the CIAC Policy. Arguably, Plaintiffs' prayer for relief does not stop with their own records allegedly impacted by the CIAC Policy. In paragraph E, Plaintiffs seek the removal of "record times" achieved by transgender girls from "*any records purporting to record times achieved by girls or women,*" seemingly irrespective of whether the record times personally impacted Plaintiffs. App'x 176 (emphasis added). In paragraph D, Plaintiffs ask for an order requiring Defendants both to remove transgender girls from "*any record or recognition purporting to record times, victories, or qualifications for elite competitions designated for girls or women,*" and to give non-transgender female athletes the "credit and/or titles" they would have received in races but for the participation of transgender girls. *Id.* (emphasis added). To the extent that these prayers for relief request that Defendants update records that have no bearing on Plaintiffs'

31

own athletic achievement—such as by removing the victories of transgender girls who never competed against Plaintiffs or by making revisions to records that would only benefit non-transgender girls who are not parties to this suit—Plaintiffs have no standing.

"Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107. Here, Plaintiffs allege an injury in fact because they claim that they were *personally* denied equal athletic opportunities and experienced the associated loss of publicly recognized titles and placements. A "generalized grievance[]" that a school's athletic offerings violate Title IX would be "too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217, 227 (1974). By the same token, the remedy sought must redress the particularized harm that Plaintiffs allege. An order requiring Defendants to remove record times and achievements of transgender girls that have no impact on Plaintiffs' own athletic achievements would afford Plaintiffs at most the "psychic satisfaction" of "a

32

favorable judgment," which "is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co.*, 523 U.S. at 107. Plaintiffs may disagree with the way in which the CIAC's policy recognizes transgender girls and their athletic achievements, but policy disagreement without particularized harm is not a basis for Article III standing. Thus, Plaintiffs only have standing to seek the injunctive relief requested to the extent they seek to alter records related to the particularized injury they allege.

Second, Plaintiffs' standing to seek injunctive relief ordering Defendants to alter their athletic records is limited to the alteration of *public* athletic records. Plaintiffs' prayer for relief also asks for a court to order Defendants to alter their private records. *See* App'x 172 ("Plaintiffs are entitled to injunctive relief requiring all Defendants to correct all league or school records, public or private."). But such an order would afford Plaintiffs at most "psychic satisfaction," which, as explained above, is insufficient to establish Article III standing. *Steel Co.*, 523 U.S. at 107.

Finally, in holding that Plaintiffs have standing to seek injunctive relief ordering an alteration to certain public records, we express no view as to whether

the requested relief would be fair or appropriate, even assuming the success of Plaintiffs' claims on the merits. Defendants argue that Plaintiffs' requested relief regarding their own records would also retroactively alter Intervenors' athletic records and therefore would raise serious equitable concerns. That may be. As Plaintiffs recognized at oral argument, Intervenors "haven't done anything wrong." Transcript at 8. Like Plaintiffs, their participation in girls' track events was consistent with the existing CIAC Policy. Moreover, Intervenors participated in girls' track to the exclusion of other opportunities, which they could not now go back and pursue. Defendants and Intervenors also argue that the novelty of the requested injunctive relief makes it an unsuitable means of remedying the alleged injury in fact.

Defendants view such equitable considerations as barriers to establishing Article III redressability. And although Intervenors agree with our conclusion that Plaintiffs have alleged an injury in fact likely redressable by monetary damages, their brief argued that it could not be redressed by an injunction ordering an alteration of the records because "depriving other athletes of victories [they] won

34

based on the rules in place at the time" would be purportedly "unprecedented." Intervenors' Br. at 32. But Intervenors walked back this position at oral argument and agreed with Plaintiffs that arguments about the requested relief's unprecedented nature, however persuasive, may not go to our jurisdiction to hear Plaintiffs' claims. We adopt that view.

The fairness, justice, and novelty of a remedy do not speak to its ability to "redress a cognizable Article III injury." *Steel Co.*, 523 U.S. at 107. Instead, as Plaintiffs and Intervenors agreed at oral argument, the district court would evaluate such equitable considerations when exercising its discretion to fashion appropriate injunctive relief if the case proceeds to that stage. "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course," and "the balance of equities and consideration of the public interest [] are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). The fact "that [a] plaintiff has standing to pursue her claim does not mean that she is entitled to the relief she seeks." *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d

442, 461 (2d Cir. 2014). Factors such as whether the requested relief is "justified," "reasonable," and fair "bear not on our standing analysis under Article III, but on the equities of [the] plaintiff's claim for relief." *Id.* Likewise, to the extent that there may be legal obstacles to the requested injunction, "the legal availability of a certain kind of relief" goes to the merits, not jurisdiction. *Chafin v. Chafin*, 568 U.S. 165, 174 (2013); *accord MOAC Mall Holdings LLC v. Transform Holdco LLC*, 143 S. Ct. 927, 935 (2023).

In sum, Plaintiffs have plausibly alleged a concrete, particularized, and actual injury in fact redressable by monetary damages or an injunction ordering Defendants to alter public athletic records related to the particularized injury they allege.

## II. *Pennhurst* **Notice**

Though our jurisdictional inquiry ends with standing, the district court dismissed Plaintiffs' claims for monetary damages on different grounds: Defendants' lack of notice of liability under Title IX. We vacate that portion of the district court's opinion on narrow grounds, based on the district court's erroneous

36

conclusion that it must resolve the question of notice before reaching the merits of Plaintiffs' Title IX claims.

An implied private right of action exists under Title IX, and because the right is judicially implied, courts "have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). In addition to injunctive relief, monetary damages are an available remedy in private Title IX actions. *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992). However, because Congress enacted Title IX pursuant to its Spending Clause power, private damages are not necessarily available for every violation of Title IX. In *Pennhurst State School & Hospital v. Halderman*, the Supreme Court explained that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." 451 U.S. 1, 17 (1981). Accordingly, "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State [or funding recipient] voluntarily and knowingly accepts the terms of the 'contract'" and there can "be no knowing

acceptance if a State [or funding recipient] is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* The contractual nature of Spending Clause legislation limits not only "the scope of conduct for which funding recipients may be held liable for money damages" but also "the scope of available remedies in actions brought to enforce Spending Clause statutes. After all, when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow, but also what sort of penalties might be on the table." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022) (cleaned up).

In the context of Title IX, the Supreme Court has held that *Pennhurst* does not bar private damages "where the funding recipient engages in intentional conduct that violates the clear terms of the statute," *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999), such as when school officials choose not to stop a teacher's sexual harassment of a student or when a school board retaliates against a teacher for complaining about sex discrimination in the school's athletic program. *See Franklin*, 503 U.S. at 74–75 (sexual harassment);

38

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005) (retaliation). But in cases "that do not involve official policy" of the school receiving federal funding, private damages are unavailable unless an official with authority to act on the school's behalf has "actual knowledge of discrimination in the recipient's programs" and is deliberately indifferent. *Gebser*, 524 U.S. at 290.

Plaintiffs and Defendants in this case dispute (1) whether *Pennhurst*'s notice requirement is applicable to Title IX suits challenging an official policy of a funding recipient, such as the CIAC Policy, and (2) if so, whether the notice requirement is satisfied. The district court and panel both determined that Plaintiffs must satisfy the *Pennhurst* notice requirement to seek monetary damages, and that they failed to do so. We need not and do not reach these questions because we vacate the district court's judgment on another basis: its apparent—and erroneous—determination that it lacked discretion to reach the merits of Plaintiffs' claims without first determining if monetary damages would be available under *Pennhurst*.

In opposing Defendants' motion to dismiss, Plaintiffs argued that "the question of notice should be deferred until a later stage of the case." *Soule*, No. 20-cv-201, 2021 WL 1617206, at \*8 n.13. Addressing this argument, the district court determined that it lacked the discretion to do what Plaintiffs asked, reasoning that "if the plaintiffs' claims for money damages are barred due to lack of adequate notice, the action is subject to dismissal in its entirety because the only remaining form of relief sought in this case—attorney's fees and expenses—is insufficient, standing alone, to sustain jurisdiction." *Id.* (quotation marks omitted). In other words, the district court concluded that in order to reach the merits, it had to determine whether it had jurisdiction. And, having determined that there was no standing to seek injunctive relief, the district court concluded that it must first assess whether monetary damages are available under *Pennhurst*. The district court erroneously concluded that if monetary damages are not available under *Pennhurst*, it would be required to dismiss the entire matter on jurisdictional grounds. But as noted previously, "the legal availability of a certain kind of relief" does not impact a court's jurisdiction to decide a claim. *Chafin*, 568 U.S. at 174.

Moreover, we agree with Intervenors that there are strong reasons for addressing the merits first in this case. To begin, none of *Pennhurst*'s Title IX progeny have analyzed notice as a freestanding issue before reaching the merits. Instead, the Supreme Court cases applying *Pennhurst* to Title IX either begin with a merits analysis of whether the challenged conduct was prohibited or weave that analysis into considerations of notice. *See Franklin*, 503 U.S. at 75; *Gebser*, 524 U.S. at 280–93; *Davis*, 526 U.S. at 643; *Jackson*, 544 U.S. at 182–84.

We leave open the possibility that there may be circumstances in which it would be appropriate to decide the question of notice as a threshold freestanding issue. But under the circumstances of this present dispute, we direct the district court on remand to reach the merits before or in tandem with the question of notice. The parties here do not debate whether there was adequate notice of conduct. Defendants obviously knew that the CIAC Policy existed. Rather, the debate surrounds whether there was adequate notice that the CIAC Policy violates

41

Title IX and whether such notice is even required.[7]  The question of adequate

notice is difficult to answer without first considering whether the CIAC Policy

does indeed violate Title IX.  The entwinement of what the law requires and

whether there is notice of what the law requires is especially apparent where, as

here, Plaintiffs argue that the requisite notice stems from the statutory text itself—

not, for example, a judicial decision or agency guidance.  *Cf. Bennett v. Ky. Dep't of*

*Educ.*, 470 U.S. 656, 666 (1985) (explaining that *Pennhurst* was no defense to liability

because "[t]he requisite clarity in this case is provided by Title I; States that chose

to participate in the program agreed to abide by the requirements of Title I as a

condition for receiving funds").

    This sequencing approach—reaching the merits before or in tandem with

the question of notice—also has the benefit of aiding in the development of the

---

[7] In *Mansourian v. Regents of the University of California*, 602 F.3d 957 (9th Cir. 2010), the Ninth Circuit held that "no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision," including "decisions with respect to athletics," which are "easily attributable to the funding recipient and always—by definition—intentional."  *Id.* at 967–68 (cleaned up).  Plaintiffs ask us to join the Ninth Circuit in holding that *Pennhurst*'s notice requirement does not apply to Title IX claims based on an official policy.  Because we vacate the district court's *Pennhurst* holding on a different basis, we decline to reach this question.

law, at least in the circumstances of this case. If courts skip ahead to ask whether damages will be available under *Pennhurst*, then there may be fewer opportunities for Title IX law to develop on the merits in suits seeking only monetary relief, which means fewer opportunities for funding recipients to be put on notice as to what Title IX requires of them.[8] And unlike, say, qualified immunity—which provides "an immunity from suit"—*Pennhurst* notice is "a mere defense to [damages] liability," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), so there is not the same countervailing reason to avoid resolving the merits first.

In sum, the district court was not required to consider whether monetary damages are barred under *Pennhurst* before reaching the merits of Plaintiffs' Title IX challenge. For that reason, we vacate the portion of its decision dismissing Plaintiffs' claim for monetary damages. On remand, the district court shall consider the merits before or in tandem with the question of notice.

---

[8] The concern with allowing the law to develop will not present itself when plaintiffs properly maintain a claim for injunctive relief. But unlike in this case, plaintiffs do not always—and sometimes cannot—bring and sustain injunctive claims. *See, e.g., Cook*, 992 F.2d at 19 (collecting cases).

## CONCLUSION

The holding of the *en banc* Court is limited. A majority of the Court concludes that Plaintiffs have standing to sue for some of the injunctive relief outlined in the complaint. As to the availability of monetary damages, a different majority of the Court concludes that the district court on remand must resolve the underlying merits question before or in tandem with the *Pennhurst* question. Although competing concurring and dissenting opinions join issue on how the *Pennhurst* analysis should be resolved and whether money damages are available, a majority of the Court concludes a remand is appropriate *without* resolution of these issues at this stage. At base, a broad majority of the Court adopts the outcome advocated for both by Plaintiffs and by the girls who are transgender who intervened: the case is remanded for the district court to resolve whether Plaintiffs have stated a claim for a violation of Title IX.

The splintered nature of the Court's opinions should not in any way suggest that its holding encompasses a determination on that highly contested underlying merits question. It does not. The Court reaches no conclusion as to whether

44

Plaintiffs have plausibly stated a Title IX violation.  Nor does the Court opine on the question of whether—even if Plaintiffs have stated such a claim—they are entitled to any of the injunctive relief they seek.

Nor should the splintered nature of the Court's *en banc* holding obfuscate the extent of agreement reached.  The Court unanimously concludes that Plaintiffs have plausibly alleged an injury in fact, which would be redressable by monetary damages if monetary damages are available under *Pennhurst*.  This is a conclusion of standing and remedies law that implicates access to courts for everyone.

The judgment of the United States District Court for the District of Connecticut is **VACATED** and **REMANDED** for further proceedings consistent with this Opinion.  Plaintiffs' request for reassignment to a different district court judge on remand is **DENIED**.

PARK, *Circuit Judge*, joined by NARDINI and MENASHI, *Circuit Judges*, concurring:

I write to state what should be obvious but may get obscured in the flurry of separate statements accompanying today's opinion of the Court: Only the majority opinion has precedential weight. The separate writings represent the views of their respective signers alone. To the extent that they interpret the opinion of the Court or opine on issues not before the Court, they do no more than signal the personal views of the authors and joining judges. If anything, they represent what a majority of the Court did *not* join.

The Court is splintered today mainly insofar as it ventures beyond the questions we took up for en banc review. On those, the decision of the Court is clear that the district court erred in dismissing Plaintiffs' complaint.

MENASHI, *Circuit Judge*, joined by PARK, *Circuit Judge*, concurring:

I join the opinion of the court. The plaintiffs have standing to seek an injunction to modify athletic records to account for the "CIAC's policy that allow[ed] biological males to compete in girls-only events." Second Am. Compl. ¶ 82. And the district court erred in treating the *Pennhurst* notice requirement as jurisdictional.

I write separately to make three points about the Spending Clause issues in this case. First, the district court erred not only in treating *Pennhurst* as jurisdictional but also in failing to address whether the CIAC Policy was intentional conduct and therefore not subject to the notice requirement at all. Second, I would join the Fifth, Ninth, and Tenth Circuits in holding that an official policy of a recipient educational institution always qualifies as intentional conduct. For that reason, the Policy is not subject to the *Pennhurst* notice requirement. Third, even if we were to split from those circuits that have held that official policies are not subject to the *Pennhurst* notice requirement, the district court and the panel erred in concluding that the CIAC could not have been on notice that the Policy violated Title IX.

**I**

When they filed this lawsuit, the plaintiffs were "high school girls who compete[d] in interscholastic girls' track and field," each of whom "trained much of her life—striving to shave mere fractions of seconds off her race times—in order to experience the personal satisfaction of victory, gain opportunities to participate in state and regional meets, gain access to opportunities to be recruited and offered athletic scholarships by colleges, and more." *Id.* ¶ 1. According to the complaint, their "personal and attainable goals of

victory" were "taken from them" when they were "forced to compete against males with inherent physiological advantages in the girls' category." *Id.* ¶¶ 114, 117.

The plaintiffs allege that the CIAC Policy failed to provide "equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c), because it afforded "students who are born female … materially *fewer* opportunities" for athletic achievement "than students who are born male," Second Am. Compl. ¶ 4.

The entire *en banc* court now agrees that the plaintiffs have suffered an injury in fact. *See ante* at 20-23 (majority opinion); *post* at 6 (Chin, J., dissenting). Indeed, the denial of an equal opportunity to compete is an injury whether or not the plaintiffs could show that the outcome of any particular race would have been different under nondiscriminatory conditions. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) ("The injury in cases of this kind is that a discriminatory classification prevents the plaintiff from competing on an equal footing.") (internal quotation marks and alteration omitted); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' … is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (identifying the injury as "the opportunity to play for a team that can qualify for the Regional and State Championships" rather than obtaining such qualification).

The court correctly concludes that the injury is redressable by an injunction to modify the records to reflect the placements that would have occurred but for the alleged discriminatory treatment. There is no rule that equitable relief is unavailable to redress

2

discrimination if it would have the incidental effect of depriving a faultless third party of the benefits of discrimination. *See, e.g., Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976) ("[W]e find untenable the conclusion that [seniority] relief may be denied merely because the interests of other employees may thereby be affected."); *Ass'n Against Discrimination in Emp., Inc. v. City of Bridgeport*, 647 F.2d 256, 281 (2d Cir. 1981) ("[T]he mere possibility that a race-conscious remedy may have an adverse impact on nonminority individuals does not render that remedy impermissible.").[1]

Moreover, the district court would have discretion to craft an equitable remedy, so it may be possible to preserve the intervenors' records while providing an appropriate recognition to the plaintiffs, perhaps in two different categories. Even if there were a rule about avoiding an impact on third parties, the district court could provide a remedy without violating that rule.[2]

---

[1] The intervenors acknowledged this point at oral argument. *See* Oral Argument Transcript at 71 (Counsel for the intervenors stating "[L]et's say there is a discriminatory employment test that's used. Someone gets a job as a result of passing that discriminatory employment test. Courts do have broad powers to provide the job to people who were unfairly excluded, and sometimes, in some circumstances, if it's an inherently unique job, someone can be bumped, through no fault of their own. I think that is not the preferred remedy that—and courts are very reluctant to do that, but I can't say that as an absolute matter that it is never appropriate to negatively affect the right of a third party.").

[2] *See* Oral Argument Transcript at 9-10 (Counsel for the plaintiffs stating "When you're talking about equitable relief, I won't say the sky is the limit, but certainly within parameters to make sure that the harm is actually remedied, the district court does have some discretion in how they're going to award relief. It may not involve striking from the record books entirely someone else's recorded times.").

## II

I also agree with the court that the district court erred in treating the *Pennhurst* notice requirement as jurisdictional. *See ante* at 39. The *Pennhurst* notice requirement—when it applies—arises because "legislation enacted pursuant to the spending power is much in the nature of a contract" and therefore liability "rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because the question is whether there has been an *acceptance* of contractual terms, *Pennhurst* operates as a defense to liability.[3] Such a defense is waivable and not jurisdictional. *See* 23 Williston on Contracts § 63:14 (4th ed.) ("[T]he defendant has the burden of pleading and proving any affirmative defense.").

In my view, the district court made a second error: It assumed that *Pennhurst* requires notice in this case without considering whether *Pennhurst* applies at all. Before concluding that *Pennhurst* barred a damages remedy, the district court should have determined whether the Policy qualifies as "intentional conduct" for which no *Pennhurst* notice is required.

The *Pennhurst* doctrine requires the federal government to provide "clear notice" to recipients of federal funds of the terms on which the funds are granted. *Pennhurst*, 451 U.S. at 25. Shortly after *Pennhurst* was decided, the Supreme Court clarified that this notice requirement applies in the anti-discrimination context only to

---

[3] *Pennhurst* might be compared to common-law doctrines that supply a defense to a breach-of-contract claim on the theory that no enforceable agreement was made in the first place. *See* Restatement (Second) of Contracts § 110 (1981) (statute of frauds); *id.* § 152(1) (mutual mistake); *id.* § 163 (material misrepresentation).

4

"violations not involving intentional discrimination." *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 603 (1983) (opinion of White, J., announcing the judgment). No notice beyond the statutory text is required—and damages are always available—when there is "proof of intentional discrimination." *Id.* at 600.

The Supreme Court has embraced and reiterated this principle in several cases. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74 (1992) (explaining that under *Pennhurst* "remedies were limited … when the alleged violation was *unintentional*"); *id.* at 74-75 ("The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged.") (citation omitted); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) ("[R]elief in an action … alleging unintentional discrimination should be prospective only, because where discrimination is unintentional, it is surely not obvious that the grantee was aware that it was administering the program in violation of the condition.") (internal quotation marks and alteration omitted); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (noting that the *Pennhurst* "limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute" and that "*Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute"); *Barnes v. Gorman*, 536 U.S. 181, 187 (2002) ("[A] recipient may be held liable to third-party beneficiaries for intentional conduct that violates the clear terms of the relevant statute, but not for its failure to comply with vague language describing the objectives of the statute.") (citation omitted); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182

5

(2005) ("In *Gebser*, as in *Davis*, we acknowledged that federal funding recipients must have notice that they will be held liable for damages. But we emphasized that 'this limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute.'") (citations omitted) (quoting *Davis*, 526 U.S. at 642).

The district court did not address the distinction between intentional and unintentional conduct. It simply stated that "monetary relief is available in private suits under Title IX only if the defendant received adequate notice that it could be liable for the conduct at issue." *Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, No. 20-CV-201, 2021 WL 1617206, at *8 (D. Conn. Apr. 25, 2021). The district court then concluded that "[t]here can be no doubt that the clear notice required by *Pennhurst* is lacking here." *Id.* That was erroneous because the district court applied the *Pennhurst* notice requirement without first considering whether the Policy was intentional conduct.

The district court acknowledged the plaintiffs' argument that "repeated Supreme Court decisions have put educational institutions on notice that they could be subjected to private suits for intentional sex discrimination and that this liability encompasses diverse forms of intentional sex discrimination." *Id.* at *10 (internal quotation marks and alteration omitted). Yet the district court interpreted the plaintiffs' argument as addressing whether the CIAC "did receive the requisite notice." *Id.* The district court failed to appreciate that the "notice problem does not arise in a case … in which intentional discrimination is alleged." *Franklin*, 503 U.S. at 74-75.

### III

In today's opinion, the court does not address whether the Policy is intentional or unintentional conduct. *See ante* at 42 n.7. I

6

would hold that a recipient's official policy is intentional conduct. For that reason, the Policy is not subject to the *Pennhurst* notice requirement.

## A

The Supreme Court has explained that the intentional conduct inquiry asks whether the recipient engaged in "intentional conduct that violates the clear terms of the statute," *Davis*, 526 U.S. at 642; *see also Barnes*, 536 U.S. at 187, or whether "a funding recipient intentionally violates the statute," *Jackson*, 544 U.S. at 182. In applying the rule in the context of the civil rights statutes, the Court has said that the relevant distinction is between intentional and unintentional discrimination. *See Franklin*, 503 U.S. at 74-75 ("This notice problem does not arise in a case such as this, in which *intentional discrimination* is alleged.") (emphasis added); *Gebser*, 524 U.S. at 287 ("[R]elief in an action … alleging *unintentional discrimination* should be prospective only, because where discrimination is unintentional, it is surely not obvious that the grantee was aware that it was administering the program in violation of the condition.") (internal quotation marks and alteration omitted and emphasis added). In *Guardians*, the Court indicated that the distinction between unintentional and intentional discrimination is between "unintentional, disparate-impact discrimination," on the one hand, and "deliberate racial discrimination," on the other. 463 U.S. at 593 (opinion of White, J.).

The distinction between intentional and unintentional conduct may not be simple to apply in every case. But in this context, the Supreme Court has already answered the question: Official policies of recipients of federal funds qualify as intentional conduct under Title IX.

In *Gebser*, the Court explained that "[w]hen Congress attaches conditions to the award of federal funds under its spending power, U.S. Const., Art. I, § 8, cl. 1, as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition." 524 U.S. at 287 (citing *Franklin*, 503 U.S. at 74-75; *Guardians*, 463 U.S. at 596-98 (opinion of White, J.); *Pennhurst*, 451 U.S. at 28-29). We do so because of the "central concern" with "ensuring that 'the receiving entity of federal funds [has] notice that it will be liable for a monetary award.'" *Id.* (quoting *Franklin*, 503 U.S. at 74). The Court said that if a recipient's liability "rests on principles of constructive notice or *respondeat superior*, it will … be the case that the recipient of funds was unaware of the discrimination." *Id.*

For that reason, the Court "fashioned" the "implied damages remedy" under Title IX along the same lines as the statute's "express remedial scheme." *Id.* at 290. Because the express remedial scheme was "predicated upon notice to an 'appropriate person'" who received "an opportunity to rectify any violation," the damages remedy would be subject to actual-notice and opportunity-to-cure requirements. *Id.* (quoting 20 U.S.C. § 1682). In other words, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* The response "must amount to deliberate indifference to discrimination" so as to parallel the "premise" of the administrative enforcement scheme that there be "an official decision by the recipient not to remedy the violation." *Id.*

The Court confined the deliberate indifference framework to "cases like [*Gebser*] that do not involve official policy of the recipient

entity." *Id.* In cases that do involve "official policy," there is no reason to require notice, opportunity to cure, and deliberate indifference in order to establish the equivalent of "an official decision by the recipient." *Id.* That is because an official policy already represents such an official decision, made intentionally by the recipient itself. Unlike rogue behavior by an employee, there is no problem of attribution to the recipient when the recipient itself has officially adopted a policy. *See Jackson*, 544 U.S. at 183 (explaining that retaliation is "intentional conduct that violates the clear terms of the statute" because "[i]t is easily attributable to the funding recipient, and it is always—by definition—intentional").

In *Gebser*, the Court explained this framework by way of an analogy to 42 U.S.C. § 1983. *See Gebser*, 524 U.S. at 290-91. The "§ 1983 municipal-liability cases reveal how the standard changes when the claim involves official policy, although the underlying principle—liability only for intentional acts by the institution itself—remains the same." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (internal quotation marks, citation, and alteration omitted). Pursuant to § 1983, a plaintiff may sue any person acting "under color" of state law for a violation of a federal or constitutional right. 42 U.S.C. § 1983. [4] But a § 1983 claim is not available against a municipality—just as a Title IX claim is not available against an educational program receiving federal funds—unless the liability arises from the municipality's "own official decision," not "its

---

[4] While a § 1983 claim is available against a state officer for the violation of a federal right, a Title IX claim is not available against an employee of a school because the employee is not an "education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). But both § 1983 and Title IX contemplate liability for the employing entity: the municipality in the § 1983 context and the recipient educational program under Title IX.

employees' independent actions." *Gebser*, 524 U.S. at 291. Municipal liability can be established by showing that the actions of the municipality "amount[ed] to deliberate indifference to the rights of persons with whom [its employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Alternatively, the municipality may be liable if the plaintiff establishes that the municipality's "official policy[] inflict[ed] the injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). In this way, under both § 1983 and Title IX, intentional conduct may be established by way of deliberate indifference to the acts of employees *or* by way of an official policy. *Gebser* and *Davis* involved the former. This case involves the latter.

For these reasons, three circuits have held, in the Title IX context, that the official acts—including policies—of a recipient of federal funds qualify as intentional conduct and are not subject to a further *Pennhurst* notice requirement. *See Mansourian v. Regents of Univ. of Calif.*, 602 F.3d 957, 967 (9th Cir. 2010) ("[T]he Supreme Court has made clear that no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision."); *Simpson*, 500 F.3d at 1178 ("[A] funding recipient can be said to have 'intentionally acted in clear violation of Title IX' when the violation is caused by official policy.") (quoting *Davis*, 526 U.S. at 642); *Pederson v. La. State Univ.*, 213 F.3d 858, 882 (5th Cir. 2000) (explaining that when it is "the institution itself that is discriminating" by "denying females equal athletic opportunity … [t]he proper test is not whether [the institution] knew of or is responsible for the actions of others" but whether it "intended to treat women differently on the basis of their sex by providing them unequal athletic opportunity"). I would join these circuits.

10

**B**

The dissent notes that "a Title IX recipient's liability cannot turn solely on the 'intentionality' of its challenged action." *Post* at 40. And that is true: there must be intentional conduct as well as knowing acceptance of a funding condition that the conduct violates. Because the CIAC Policy is intentional conduct, the remaining question is whether that conduct "violates the clear terms of the statute." *Davis*, 526 U.S. at 642.

The Supreme Court has clarified that the "clear terms" inquiry is about ensuring that the statute clearly establishes a funding condition. In *Barnes*, the Court distinguished between "intentional conduct that violates the clear terms of the relevant statute," on the one hand, and actions that "fail[] to comply with vague language describing the objectives of the statute," on the other. 536 U.S. at 187; *see also Pennhurst*, 451 U.S. at 25 (identifying "[t]he crucial inquiry" as whether the statute "provid[es] clear notice" to a recipient that it, "by accepting funds under the Act, would indeed be obligated to comply with" a funding condition). Accordingly, conduct violates the "clear terms of the statute" when it contravenes a legal requirement articulated in the statute rather than a general statutory objective.[5]

The "clear terms" requirement does not establish a standard resembling qualified immunity, pursuant to which a defendant will

---

[5] The Supreme Court has not required clarity in the scope of the legal requirement as distinct from its existence. In *Davis*, the Court decided that Title IX provided clear notice for recipients to be liable for student-on-student harassment despite "a conflict in the Circuits" over the question, 526 U.S. at 637, and the opinion of four justices that the statute was insufficiently clear, *see id.* at 657 (Kennedy, J., dissenting) (objecting that "the majority finds statutory clarity where there is none" and "treats the issue as one of routine statutory construction alone").

11

be liable only if his actions "violate[d] clearly-established rights of which an objectively reasonable official would have known." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006)). The "clear terms" requirement is satisfied if the statutory language creates enforceable legal rights; a plaintiff need not demonstrate that the rights are "clearly established" and that reasonable officials "would have known" about those rights.

In this case, the plaintiffs sued under Title IX, which prohibits an educational program receiving federal funds from "subject[ing] to discrimination" any person in relation to the program. 20 U.S.C. § 1681; Second Am. Compl. ¶ 33. As the dissent acknowledges, "the plain terms of Title IX place a duty on a funding recipient to not discriminate intentionally on the basis of sex." *Post* at 39. That is a clear legal mandate, not "vague language describing the objectives of the statute." *Barnes*, 536 U.S. at 187. Thus, if the Policy violates Title IX's anti-discrimination provision on the merits, it violates the "clear terms of the statute." *Davis*, 526 U.S. at 642.[6]

---

[6] The connection between the merits and the question of whether conduct violates the clear terms of the statute explains why "the Supreme Court cases applying *Pennhurst* to Title IX either begin with a merits analysis of whether the challenged conduct was prohibited or weave that analysis into considerations of notice." *Ante* at 41 (majority opinion). The dissent cites cases from outside the Title IX context in which the relevant statutes had no "clear terms" authorizing a remedy at all, so whether the conduct violated such clear terms was beside the point. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1576 (2022) (concluding that "emotional distress damages are not recoverable under … Spending Clause antidiscrimination statutes" because such "distress damages are [not] 'traditionally available in suits for breach of contract,' and [there is]

12

Even if we understood the "clear terms" requirement to involve notice beyond this low bar, the result would be the same. We have held that "[w]here Congress has explicitly directed the courts to create and administer a private right of action, judicial determination of the rules governing the scope of liability is itself, in effect, a clear statement by Congress." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 285 (2d Cir. 2003). In other words, the CIAC accepted federal funds "with the knowledge that the rules for [Title IX] liability will be subject to judicial determination." *Id.*[7] That the CIAC was subject to conflicting guidance from the Department of Education on this issue, *see* Appellees' Br. 62, made clear that the issue implicated Title IX and would ultimately be decided by a court.

I would hold that official policies of a recipient of federal funds qualify as intentional conduct. And if the CIAC Policy violates Title IX on the merits, then it violates the clear terms of the statute. For these reasons, the *Pennhurst* notice requirement does not bar the plaintiffs' damages claim.

---

correspondingly no ground … to conclude that federal funding recipients have 'clear notice' that they would face such a remedy in private actions brought to enforce the statutes at issue").

[7] The Fourth Circuit relied on similar reasoning to conclude that *Pennhurst* did not bar damages in a transgender student's lawsuit to access the boys' bathroom. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 n.18 (4th Cir. 2020) ("Title VII has repeatedly produced unexpected applications, at least in the view of those on the receiving end of them. So too Title IX. And the Board knew or should have known that the separate facilities regulation did not override the broader statutory protection against discrimination. We reject the Board's *Pennhurst* argument.") (internal quotation marks and citation omitted).

## IV

Even if the Policy somehow qualified as unintentional conduct and was subject to the *Pennhurst* notice requirement, the district court and the panel erred in holding that either the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), or appellate case law about bathroom access forecloses a finding that the CIAC was on notice that it needed to provide "equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c).

*Bostock* did not establish that assigning sports teams based on biological sex would constitute discrimination, much less hold that "discrimination based on transgender status is generally prohibited under federal law." *Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43, 56 (2d Cir. 2022). *Bostock* held that Title VII prohibits the firing of an employee based on transgender status because such discrimination would amount to discrimination based on biological sex. The Court explained that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. It offered the hypothetical of "an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" and "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 1741-42. In reaching its conclusion, the Court accepted the premise that "sex" in Title VII refers "only to biological distinctions between male and female." *Id.* at 1739; *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[S]ex,

14

like race and national origin, is an immutable characteristic determined solely by the accident of birth.").

Moreover, there are important differences between the two statutes. While Title VII makes sex "not relevant to the selection, evaluation, or compensation of employees," *Bostock*, 140 S. Ct. at 1741 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion)), the Title IX framework expressly allows a funding recipient to maintain separate sports teams based on sex, 34 C.F.R. § 106.41(b), provided that the recipient offers "equal athletic opportunity for members of both sexes," *id.* § 106.41(c). In other words, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022). In fact, the Title IX framework effectively requires a recipient to maintain separate sports teams.[8] Thus, while an employer risks Title VII liability when it

_____

[8] *See, e.g.*, *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers) ("Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events."); *Neal v. Bd. of Trs.*, 198 F.3d 763, 767 (9th Cir. 1999) ("Male athletes had been given an enormous head start in the race against their female counterparts for athletic resources, and Title IX would prompt universities to level the proverbial playing field."); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993) ("If, to satisfy [T]itle IX, all that the School District were required to do was to allow girls to try out for the boys' teams, then it need not have made efforts … to equalize the numbers of sports teams offered for boys and girls."); *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic

makes distinctions among employees based on sex, an education program risks Title IX liability when it *fails* to distinguish between student athletes based on sex. The division that the plaintiffs propose here—separating teams on the basis of sex—is what the Title IX regulations authorize. *Bostock* does not suggest that Title IX requires separating athletic teams on a different basis.

The district court cited several cases from other circuits for the proposition that the CIAC Policy was required by federal law. *See Soule*, 2021 WL 1617206, at *10 ("Courts across the country have consistently held that Title IX requires schools to treat transgender students consistent with their gender identity.") (collecting cases); *see also Soule*, 57 F.4th at 55-56. Each of those cases concerns bathrooms rather than athletic competitions.

The circuits are split on the question of whether Title IX permits a school to maintain separate bathrooms based on biological sex. The Eleventh Circuit has held that "Title IX allows schools to provide separate bathrooms on the basis of biological sex." *Adams*, 57 F.4th at 817. More importantly, bathrooms are not athletic competitions. The plaintiffs argue that allowing biological males to enter girls' athletic competitions denied them "equal athletic opportunity," 34 C.F.R. § 106.41(c), because it limited their opportunities for athletic achievement. The different circumstances and regulatory framework applicable to bathrooms does not answer that argument.

The context is important. "[T]hat a characteristic may be relevant under some or even many circumstances does not suggest any reason to presume it relevant under other circumstances where there is reason to suspect it is not. A sign that says 'men only' looks

---

involvement."); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women … are enduring.").

16

very different on a bathroom door than a courthouse door." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *see also Davis*, 526 U.S. at 651 ("Courts, moreover, must bear in mind that schools are unlike the adult workplace."). *Bostock* took this careful contextual approach. It had nothing to say about bathrooms. *Bostock*, 140 S. Ct. at 1753 ("[W]e do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind. The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'"). Neither *Bostock* nor the case law about bathrooms tells recipients how to provide equal athletic opportunity in educational programs.

\* \* \*

The merits question in this case has not yet been decided. Today, the court correctly holds that the district court erred in concluding that standing requirements and *Pennhurst* notice prevented that question from being addressed. I join its opinion. But I would also hold that the district court erred in its *Pennhurst* analysis by failing to consider whether an official policy was intentional conduct and by determining that inapposite case law foreclosed the conclusion that the CIAC had adequate notice.

17

NATHAN, *Circuit Judge*, joined by ROBINSON, *Circuit Judge*, concurring:

Stepping back from some of the abstract legal concepts at issue in this appeal, it is important to say that this case is, at root, about kids who want to compete in high school track and field. At the time this lawsuit was brought, Plaintiffs were such kids. So were Intervenors Andraya Yearwood and Terry Miller. Andraya and Terry competed on the girls' track-and-field teams at their respective high schools when they were teenagers. Before that, in the summer before her eighth-grade year, Andraya came out to her parents as transgender and began receiving social and medical support for her transition. By the time she started at Cromwell High School, she was known to her family and peers as a girl, participating in all aspects of high school life consistent with her gender identity.

Terry recalls being aware of her female gender identity as early as the fifth grade, but she did not have the language or support to understand what it would take to live authentically. Terry finally began to live her life as a girl after coming out in the tenth grade. And just like Andraya, Terry was known and accepted as a girl by her family, friends, teammates, and coaches at Bloomfield High School.

Andraya and Terry presumably competed in high school track and field for the same reasons as Plaintiffs: "because they love to run; because being a part of a

1

team provided them a supportive community and created lasting social and emotional relationships; because training and competition allowed them to prove their athletic skills, challenge themselves, and release stress and anxiety; and because athletics gave them a place to be themselves and thrive." Intervenors' Br. at 1. Indeed, these benefits can have special importance for transgender students, "who are at heightened risk for feelings of isolation, discrimination, harassment, and low self-esteem." Am. Br. of the Nat'l Women's L. Ctr. & 34 Additional Civ. Rts. & Other Orgs., at 4.

In this case, Plaintiffs claim that it was unfair for them to have to compete against girls who are transgender and they challenge the validity of the Connecticut policy that allowed Andraya and Terry to play on their respective school's girls sports teams, consistent with their gender identity. Although that policy's legality is in dispute, I want to be perfectly clear that, as the entire Court has recognized, *see* Maj. Op. at 34; Diss. Op. at 23, "Andraya and Terry followed all the rules of competition, on and off the field"; put simply, they themselves "have done nothing wrong." Intervenors' Br. at 1.

This brings me back to the standing issue our Court resolves today— namely, whether Plaintiffs have standing to challenge the Connecticut policy and

2

seek monetary and injunctive relief. The interest that transgender students like Andraya and Terry have in participating in high school athletics compels me to consider how I would resolve this standing question if the shoe were in fact on the other foot. *See* Maj. Op. at 28-29. Imagine a cross-country race in which all athletes run together, but girls' and boys' times and placements are reported separately. Presume the school district refuses to list the times and placements of transgender girls as girls, listing them instead as boys. As a result of that policy, a girl who is transgender is deprived of the higher placement and title she would have received had she been listed as a girl. Now imagine that transgender girl brings suit alleging that the school district had violated Title IX by refusing to list her placement and times based on her established gender identity. She seeks money damages, but she also seeks an injunction to correct those records in order to accurately reflect her athletic achievement.

In my view, if you would conclude that this hypothetical plaintiff would have standing to seek such injunctive relief, then you should conclude the same as to Plaintiffs in this case. The majority's holding that the public recognition of students' athletic achievements, as reflected in the records documenting those achievements, is a cognizable interest in the eyes of the law ensures that federal

3

courts are accessible not only to Plaintiffs in this case, but litigants like Terry and Andraya in some future case. For this reason, it is not surprising that Terry's and Andraya's own lawyers suggested at oral argument that we could conclude, as the majority has, that Plaintiffs do have standing. *See* Transcript at 63-64, 66, 68, 69, 71-72.

Of course, standing conclusions only get litigants in the courthouse door. On remand, the district court will determine if Plaintiffs have stated a claim for a violation of Title IX. If they have, the district court will assess whether Plaintiffs are entitled to any remedies. These are highly contested questions. The merits issue includes consideration of the meaning of the word "sex" as contained in Title IX, implementing regulations, and policy interpretations. It will also include consideration under those authorities of what constitutes denial of equal athletic opportunity. Moreover, should the district court reach the question of injunctive relief, it will have to consider how to balance principles of fairness and equality. It bears emphasis that, as the majority explains, the Court's decision today expresses no views on these contentious issues. *See* Maj. Op. at 44-45.

Because the issue the Court resolves is standing, I have done my level best to put any preliminary merits views aside. Noteworthy though is that the merits

4

question in this case is not whether Title IX requires schools to allow transgender girls like Andraya and Terry to compete on girls' sports teams.[1]  Rather, the question is whether Title IX actively *prohibits* schools from doing so.  Put otherwise, to prevail on the merits, Plaintiffs must show that Title IX requires schools to exclude transgender girls from competing on girls' sports teams consistent with their established gender identity.  This is an interpretation of Title IX that no court has ever adopted—a fact that remains true after our decision today.  Nothing in the Court's decision adopts Plaintiffs' construction of Title IX.

---

[1] One of our sister circuits has held that a categorical ban on the participation of transgender women and girls in women's student athletics likely violates the Equal Protection Clause. *See Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023) (affirming the district court's grant of preliminary injunctive relief because the law "categorically bans transgender girls and women at all levels from competing on female, women, or girls teams" and the state "failed to adduce any evidence demonstrating that the Act is substantially related to its asserted interests in sex equality and opportunity for women athletes" (cleaned up)).  A similar law enacted in West Virginia is currently enjoined pending review by the Fourth Circuit.  *See B.P.J. v. W. Virginia State Bd. of Educ.*, 2023 WL 2803113, at *1 (4th Cir. Feb. 22, 2023) (granting a motion for injunction pending appeal after the district court determined that West Virginia's law is neither unconstitutional nor violates Title IX).

LOHIER, *Circuit Judge*, concurring in part and dissenting in part:

I.

I concur in Part I of the majority opinion insofar as it concludes that Plaintiffs have standing to sue for injunctive relief to alter their own public athletic track records "related to the particularized injury they allege." Majority Op. 36. As I understand it, the particularized alleged injury in this case arises only from the public records reflecting Plaintiffs' final placements in specific races at specific track meets at which they competed against and finished behind Intervenors.

The majority opinion acknowledges two further limitations that bear repeating. First, Plaintiffs "do not have standing to seek remedies for generalized grievances about the CIAC Policy." Majority Op. 31. Second, "the fact that a plaintiff has *standing* to pursue her claim *does not mean* that she is entitled to" *any* relief.[1] Majority Op. 35 (emphasis added and cleaned up)

---

[1] As some of my dissenting colleagues point out, "the preferable remedy in a case such as this is the more traditional one of monetary relief." Dissenting Op. 25. I completely agree. But the fact that money damages are the *preferable* remedy in this case has nothing to do with Plaintiffs' standing to pursue the more difficult course of injunctive relief.

(quoting *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014)).  Standing opens the courthouse door but offers nothing more.

A final point of agreement about standing in this case is simple but important: the broader approach to redressability that our Court announces today is not limited to Title IX cases.  It extends just as forcefully to cases arising under Title VII and other federal civil rights statutes.  It is precisely because we are not free to apply different standing doctrines to different plaintiffs that none of my colleagues disagree with me on this point.

## II.

For the reasons stated by Judge Chin, I would affirm the District Court's dismissal of Plaintiffs' claims for nominal money damages under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981).  As Part III of Judge Chin's dissenting opinion explains, the majority opinion's take on both *Pennhurst* and the District Court's opinion is simply wrong.

In particular, the majority opinion's central criticism that the District Court misapprehended its discretion to address the merits of Plaintiffs' Title IX claims before dismissing their claims for monetary relief based on the *Pennhurst* bar does not reflect a fair reading of the District Court's decision.  I therefore agree

with the dissent that the very able and experienced District Judge fully understood his discretion to consider the merits of the Title IX claims, but elected instead to determine that *Pennhurst* barred those claims – a far easier and more straightforward issue in this case. Dissenting Op. 27–37. As to that determination, the District Court and the dissent are right that Defendants could not possibly have been on notice of any Title IX violation. To the contrary, every indication was that Defendants risked a lawsuit had they *not* adopted the CIAC policy. *See* Dissenting Op. 38–48.

In addition, much (perhaps all) of the majority's discussion of the *Pennhurst* sequencing issue is unnecessary to resolve this appeal. Let me briefly explain why. The majority opinion concludes that the District Court misapprehended its authority to sequence *Pennhurst* and the merits. Because the majority opinion also (again rightly, in my view) vacates the District Court's judgment that Plaintiffs lacked standing to seek injunctive relief, it compels the District Court to consider the merits of Plaintiffs' claims for injunctive relief under Title IX. The majority's remand on the *Pennhurst* issue is thus supported entirely by its conclusion that the District Court should revisit the sequencing now that it must consider the merits. Any discussion of the factors that might

limit the District Court's discretion as to which issue to take up first – the merits

or the lack of notice – is therefore non-precedential dicta.

Finally, because standing is "a sufficient ground for deciding this case, . . .

the cardinal principle of judicial restraint — if it is not necessary to decide more,

it is necessary not to decide more — counsels us to go no further" and to avoid

prematurely deciding the *Pennhurst* issue. *PDK Labs. Inc. v. U.S. DEA*, 362 F.3d

786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the

judgment). The District Court will now address the merits of Plaintiffs' claims

for damages whether or not we instruct it to do so "before or in tandem with" its

analysis of notice under *Pennhurst.* Majority Op. 41. We know this because the

merits analysis applicable to the claim for injunctive relief applies equally to

Plaintiffs' damages claims. Accordingly, the majority's discussion of *Pennhurst*

contributes nothing of practical value to the resolution of this case. If the District

Court determines that the claims are meritless, there will be no need to address

the *Pennhurst* sequencing issue. If, on the other hand, the District Court

determines that the claims have some merit, nothing in the majority opinion

forecloses the conclusion that the damages claims are nevertheless barred under

*Pennhurst*. Nor, as I read it, does the majority opinion prohibit the District Court

4

from even more clearly acknowledging its discretion with respect to the *Pennhurst* sequencing issue and then simply reaffirming its prior decision as to the lack of the notice to Defendants in this case.

*  *  *

For these reasons I concur in Part I of the majority opinion and in Part III of Judge Chin's dissenting opinion.

No. 21-1365
*Soule v. Connecticut Association of Schools, Inc.*

PÉREZ, *Circuit Judge*, concurring in part and dissenting in part:

There are at least three issues on which the majority opinion and dissenting opinion in this case are in full agreement: (1) the Intervenors—girls who are transgender who competed in the high school track-and-field competitions at issue—did nothing wrong; (2) Plaintiffs have adequately pled a concrete, particularized injury in fact with respect to their denial of equal athletic opportunity and concomitant public recognition; and (3) Plaintiffs' alleged injuries may, at least for the purposes of the standing inquiry, be redressable through nominal or compensatory damages under Title IX.

I join Part II of the dissenting opinion because I believe that Plaintiffs have failed to allege injuries that are redressable through injunctive relief. I join Parts I.A, I.B.I., and II of the majority opinion because I believe the district court should have considered the merits of Plaintiffs' Title IX claims before or alongside the question of whether Defendants were on adequate notice under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1982), to expose them to potential damages liability. I write below to briefly explain my views.

## I.    Standing

The instant dispute in our Court as to standing is a narrow one.

Plaintiffs allege two injuries arising from Defendants' purported violations of

Title IX: a denial of equal athletic opportunity and a denial of concomitant public

recognition for their success in high school track-and-field competitions.  The

majority opinion and dissenting opinion agree that Plaintiffs have adequately

alleged an injury in fact that is causally connected to the Connecticut

Interscholastic Athletic Conference ("CIAC") policy and could be redressable

through nominal or compensatory damages.  They disagree only as to whether

these alleged injuries are plausibly redressable through injunctive relief as well.

### A.    Plaintiffs Have Standing to Seek Damages

Across the opinions in this appeal, this Court speaks in one voice

that denial of equal opportunity in violation of an antidiscrimination statute is

clearly a cognizable injury in fact.  The majority opinion points out that "[t]he

Supreme Court has identified 'discriminatory treatment' as an example of a

'concrete, *de facto*, injur[y].'"  Maj. Op. at 21 (quoting *TransUnion LLC v. Ramirez*,

141 S. Ct. 2190, 2205 (2021)).  And the dissenting opinion similarly finds that "the

denial of equal athletic opportunity under Title IX" is a potential harm "sufficient

to establish injury in fact."  Diss. Op. at 6.  That this Court agrees that Plaintiffs

2

have adequately pled an injury in fact is an important reaffirmation of our standing precedent because, as the majority opinion notes, "questions of standing . . . have broad implications for all manner of civil rights litigation and civil rights plaintiffs," and "[p]recedent and principle require that we proceed cautiously before limiting access to courts and remedies." Maj. Op. at 5.

Because all parties, as well as the majority opinion and dissenting opinion, agree that damages would provide some relief, *See* Maj. Op. at 24; Diss. Op. at 26, I will not belabor the discussion on damages.

### B. Plaintiffs' Requested Injunctive Relief Fails to Meet the Low Bar for Redressability

In addition to seeking damages, Plaintiffs also requested that the district court remedy their alleged injuries by issuing an injunction to "correct the records" of high school track-and-field competitions in which girls who are transgender competed by "reallocating" relevant titles and placements to girls who are not transgender. Appellants' En Banc Br. at 46–47. As the majority opinion notes, standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." Maj. Op. at 19 (*quoting TransUnion*, 141 S. Ct. at 2208). Plaintiffs cannot do so as to the injunctive relief they seek.

3

In general, the hurdle a plaintiff must clear to demonstrate that an injury is redressable through injunctive relief is low. Plaintiffs must establish only that the "risk [of injury] would be reduced to some extent if [Plaintiffs] received the relief they seek." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) ("To demonstrate standing, the plaintiff must . . . seek a remedy that redresses that injury."). The majority opinion points out that "Plaintiffs 'need not show that a favorable decision will relieve [their] *every* injury.'" Maj. Op. at 26 (*quoting Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). A remedy that "'would serve to . . . eliminate any effects of' the alleged legal violation that produced the injury in fact" is sufficient. Maj. Op. at 23 (*quoting Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105–06 (1998)). Thus, in the case before us, "Article III only requires that some form of altering the records 'would at least partially redress' the alleged injury." Maj. Op. at 26 (*quoting Meese v. Keene*, 481 U.S. 465, 476 (1987)).

Plaintiffs fall far short of meeting even this low bar. The dissenting opinion rejects injunctive relief because the relief requested is too speculative. I would go even further to say that the Plaintiffs have set up their alleged injuries in such a way that makes injunctive relief impossible. However low the bar for

4

the redressability of injunctive relief may be, the form of relief Plaintiffs actually request in this case is too fanciful and reliant on fiction to confer standing.

### 1. Plaintiffs' Alleged Denial of Equal Athletic Opportunity Could Be Redressed Only by Re-Running the Races—A Form of Relief that is Impossible to Grant Here

As the dissenting opinion acknowledges, when Plaintiffs initially filed their lawsuit as high school students in 2020, forward-looking injunctive relief that would address their alleged ongoing injuries was indeed available to them. *See* Diss. Op. at 7. At that time, Plaintiffs could have theoretically received an injunction enjoining the CIAC policy moving forward, and it certainly was "likely that granting [injunctive relief] would 'eliminate [some] effects of' the alleged legal violation that produced the injury in fact." Maj. Op. at 27-28 (*quoting Steel Co.*, 523 U.S. at 106). However, before any alleged injuries could be remedied, all Plaintiffs graduated from high school and all at-issue competitions were completed, placing their alleged injuries of denial of equal athletic opportunity in high school competitions firmly in the past. *See* Maj. Op. at 24-25 ("Plaintiffs' claim is based on a completed violation of a legal right . . . ." (citation and internal quotation marks omitted)).

It is axiomatic that injunctive relief is forward-looking. *See Texas v. Lesage*, 528 U.S. 18, 21 (1999). At this point in time, then, the only injunctive relief

5

that would redress the harm to Plaintiffs' equal athletic opportunity would be

"ordering do-overs of the races."  Diss. Op. at 8.

But Plaintiffs did not request that the races at issue be re-run, and for

good reason—doing so would be impossible, both jurisdictionally and

practically.  An injunction ordering the races to be re-run would require the

district court to compel countless individuals—mostly non-party competitors,

coaches, and race officials now residing far and wide—to gather and reenact a

series of years-past races in different venues across the state of Connecticut.

### 2. *Plaintiffs Instead Seek to Redress their Alleged Denial of Public Recognition through a Contrived Form of Injunctive Relief Reliant on Fiction*

Because none of the Plaintiffs are still in high school, they instead

ask the court to travel back in time and retroactively declare them high school

track-and-field champions.  This theory of injury and relief immediately

descends into contortions and inconsistencies.

Plaintiffs specifically request that public records of past high school

competitions be altered to redress alleged *ongoing* harm resulting from their lack

6

of public recognition for their high school achievements.[1]  In doing so, Plaintiffs essentially ask the district court and this Court to *pretend* that the impossible was done—that the races have been re-run without the participation of girls who are transgender.  Plaintiffs then expect the court to alter the public records of these races based on who Plaintiffs contend would have won had Intervenors Andraya Yearwood and Terry Miller not competed.  *See* Appellants' En Banc Br. at 19–20.

This attempt to retrofit a forward-looking remedy onto a past injury would require the district court to contort itself into knots and hold irreconcilable sets of facts as true.  Any resulting injunction would be the product of pure conjecture.  To elaborate, Plaintiffs allege that, but for the CIAC policy permitting girls who are transgender to participate in girls' track-and-field events, every at-issue preliminary race would have advanced a different slate of competitors to an at-issue final, resulting in differently run races with different outcomes.[2]  That is, scores of qualifying races would have been run with different slates, yielding

---

[1] Plaintiffs also request that the district court order Defendants to alter "non-public" records related to their high school track-and-field competitions.  To the extent such records exist, correction of a non-public record inherently cannot provide any relief for an alleged injury in the form of lack of public recognition.

[2] *See* Appellants' En Banc App'x at 150 ¶ 78 (alleging at least 85 different opportunities where runners would have advanced to higher level competitions but for Intervenors Yearwood and Miller's participation); *id.* at 153 ¶ 89 (alleging Miller's participation in girls' events "immediately and systematically deprived female athletes of opportunities to advance and participate in state-level competition").

different results and advancing different runners to successive races, which themselves would have been run differently and advanced different runners to championship races, and so on and so forth. As just one of many examples, Plaintiffs allege that, "[b]ut for CIAC's policy, Plaintiff Selina Soule . . . would have advanced to the next level of competition in the [2019 CIAC] indoor state championship 55m preliminary race and competed for a spot at the New England Championship." Appellants' En Banc App'x at 155 ¶ 92. According to Plaintiffs, the CIAC's policy permitted Yearwood and Miller to edge Soule out of the 2019 CIAC State Open Championship, thereby depriving Soule of an opportunity to run in (and perhaps win) the 2019 CIAC 55-meter indoor state championship. In their next breath, however, Plaintiffs also allege that, "[b]ut for CIAC's policy, Plaintiff Chelsea Mitchell would have placed first in the 55m at the indoor state championship, been named State Open Champion, received a gold medal instead of a bronze medal, and received public recognition of her achievements." *Id.* at 155 ¶ 93. But winning a race is a mutually exclusive achievement—it cannot be simultaneously true that but for the CIAC policy, Soule *could* have won that race *and* that Mitchell definitively *would* have won it.

8

Track-and-field competitions are inherently unpredictable events. Absent Yearwood and Miller's participation, every at-issue race would have been run with a different slate of competitors, which could have affected other variables such as lane placements, athlete reaction times, and false starts.[3] This unpredictability is evident in this case, as Plaintiffs Smith and Mitchell in fact outperformed Yearwood and Miller on many occasions over the course of their high school careers. *See* Intervenors' En Banc Br. at 14–17 (outlining record of numerous instances where Plaintiffs defeated Yearwood or Miller in individual races). Notwithstanding Plaintiffs' specific allegations that the results of counterfactual races are inherently uncertain, such that Soule or Mitchell could have prevailed in a but-for world, they ask the court to wade into this deep uncertainty by seeking a remedy to "correct the records and give credit and/or titles" for scores of counterfactual races.

---

[3] Academic literature has suggested that these variables significantly affect the outcome of track-and-field sprint competitions. *See, e.g.*, Espen Tønnessen, Thomas Haugen & Shaher A I Shalfawi, *Reaction Time Aspects of Elite Sprinters in Athletic World Championships*, J. Strength & Conditioning Rsch., April 2013, at 885–92 (observing that reaction time can vary between competitions and between rounds of an individual competition); Aditi S. Majumdar & Robert A. Robergs, *The Science of Speed: Determinants of Performance in the 100m Sprint*, 6 Int'l J. of Sports Sci. & Coaching, no. 3, 2011, at 485 (observing differences in athlete reaction time based on lane placement); Chris Englert et al, *The Effect of Ego Depletion on Sprint Start Reaction Time*, 36 J. Sport & Exercise Psych. 506 (2014) (observing unpredictable nature of false start penalties).

The majority opinion presents its own hypothetical, suggesting that "if some other athletic conference adopts a policy that, unlike the CIAC Policy, categorizes transgender girl athletes as boys in their public records of athletic accomplishment," girls who are transgender "would have standing to seek to have those public records altered to indicate their alleged accurate athletic achievement." Maj. Op. at 28. Indeed, if the girls who are transgender in the majority opinion's hypothetical were still high school athletes alleging an ongoing harm, they would certainly have standing to pursue forward-looking injunctive relief of some kind. No argument there. This hypothetical is of limited use, however, in the case actually before us. The majority opinion's hypothetical competitors did not ask the Court, as Plaintiffs in this appeal do, to retroactively reconstruct the results of a race that never actually happened.

Of course, courts often must engage with hypotheticals or imagine fact patterns that have not materialized, and alteration of public records will most certainly be a plausible form of relief for standing purposes in many circumstances. But just because record alteration could be a meaningful theory of redress in some alternative situation does not make it so in this case. Plaintiffs also may be correct that "the reallocation of records and medals" in this manner

10

is "commonplace" in sports. Appellants' En Banc Br. at 51. However, unlike an athletics association operating according to its own internal rules, federal courts are bound by Article III's standing requirement. The fact that athletics associations have taken such actions in the past according to their own internal rules does not relieve Plaintiffs of their burden of establishing "the nexus between relief and redress" for the purposes of Article III standing. *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 157 (2d Cir. 1992).[4]

Our precedent and the majority opinion are crystal clear that it is far easier for a plaintiff to satisfy standing burdens than to demonstrate entitlement to a remedy. A plaintiff has much leeway in bringing cases that will get heard on the merits. Similarly, our precedent does not limit a court's equitable power to only the relief that a plaintiff requests. And courts' equitable powers permit and even demand creativity, novelty, and imagination in fashioning remedies. However, Article III limits federal courts' equitable powers to relief that would at least partially redress a party's injuries. Plaintiffs in this

---

[4] For reasons capably pointed out by the dissenting opinion, Plaintiffs' pleadings also do not explain how retroactively stripping Yearwood and Miller of their placements and reallocating spots in championship races would provide meaningful public recognition to individuals who are now several years removed from competing in high school track-and-field. *See* Diss. Op. at 17–19.

case fail to demonstrate how their contrived and fictitious theory of relief, which would require the court to reconstruct the results of counterfactual races involving multiple participants who have long since graduated from high school, would even partially redress an injury.

Judge Menashi's concurring opinion suggests that "it may be possible to preserve [Yearwood and Miller's] records while providing an appropriate recognition to the plaintiffs, perhaps in two different categories." Conc. Op. of Menashi, *J.*, at 3. This suggestion falls into the same pitfalls as Plaintiffs' own requested injunction. What would "an appropriate recognition" consist of, other than a judicial declaration that another individual could have won the race had Yearwood or Miller not competed? And how could such a judicial declaration account for the fact that multiple individuals, including in many circumstances multiple Plaintiffs, competed in each of the at-issue races and hypothetically could have won but for the CIAC policy?

The awkwardness of this case's pleadings stems from Plaintiffs' attempt to retrofit a forward-looking remedy onto a past injury. The bar for redressability is indeed low—but at some point, a theory of injunctive relief

12

becomes too fanciful and unrealistic for a court to credit.  This case has reached that point.

## II.    *Pennhurst* **Notice**

On the question of whether Plaintiffs are potentially entitled to damages under Title IX, I would hold that the district court erred in resolving the question of notice under *Pennhurst* before analyzing the merits of Plaintiffs' Title IX claims in this matter.  I acknowledge the dissenting opinion's thoughtful observation that courts conduct *Pennhurst* sequencing in different ways and no precedent explicitly prohibits assessing notice before considering merits.  *See* Diss. Op. at 31-32.  But in this particular case, as Plaintiffs allege, any requisite notice would likely stem from the text of Title IX itself and the statute's implementing regulations.  Thus, some interpretation of Title IX would appear necessary to determine what notice Defendants had.  The notice and merits inquiries are thus intertwined, and the district court erred in considering notice to the exclusion of merits.

The Supreme Court has conducted *Pennhurst* sequencing in a variety of ways.  For example, it has sometimes considered merits first when looking at a claim for monetary damages under a Spending Clause statute.  *See, e.g., Jackson v.*

*Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (finding that "[r]etaliation against a person because that person has complained of sex discrimination is . . . intentional sex discrimination encompassed by Title IX's private cause of action" before proceeding to determine whether Defendant was on notice that their conduct violated Title IX).  In other situations, it has merged the merits and notice inquiries.  *See, e.g.*, *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) ("We consider here whether the misconduct identified . . . amounts to an intentional violation of Title IX, capable of supporting a private damages action . . . .  Additionally, the regulatory scheme surrounding Title IX has long provided funding recipients with notice that they may be liable for their failure to respond to the discriminatory acts of certain nonagents.").  However, the Supreme Court has rarely considered notice first to the exclusion of merits because notice is, in most cases, a function *of* merits: The statutory text and implementing regulations typically *constitute* a funding recipient's notice of funding conditions.  *See, e.g.*, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("In considering whether the [Spending Clause statute] provides clear notice, we begin with the text. . . .  '[C]ourts must presume that a

legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Ct. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).

The implied rule extending from that line of cases is thus quite plain: When the alleged notice arises from the actual text of a Spending Clause statute, a court generally cannot consider whether a funding recipient was on notice without also analyzing whether the text of the Spending Clause statute prohibits the at-issue conduct.

The dissenting opinion points to several cases in which courts have considered notice before merits. *See* Diss. Op. at 32. None of these cases, however, required interpretation of statutory or regulatory text because the at-issue Spending Clause statutes were silent as to available remedies. For example, in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022), the Supreme Court made clear that it would have started its *Pennhurst* analysis with the merits *if it had text to interpret*. Instead, the Court found that "[b]ecause the statutes at issue are silent as to available remedies, it is not obvious how to decide whether funding recipients would have had the requisite 'clear notice regarding the liability at issue in this case.'" *Id.* at 220.

15

In my view, the merits and notice inquiries in this case are indeed intertwined, and the district court should not have considered notice to the exclusion of merits. On remand, the district court should reconsider its *Pennhurst* holding on a fuller record. As the majority opinion points out, it is not clear whether the district court fully understood that resolution of *Pennhurst* notice is not a prerequisite to merits analysis. Maj. Op. at 39. Nor did it seem to understand that *Pennhurst* notice could be a function of merits analysis. Indeed, Title IX and its implementing regulations give the district court an ample starting point for determining whether Defendants "had adequate notice that they could be liable for the conduct at issue." *Davis*, 526 U.S. at 640. Plaintiffs recognized as much, as their pleadings "argue that the requisite notice stems from the statutory text itself," and not from "a judicial decision or agency guidance." Maj. Op. at 42. Given the text of the statute itself and the context of Plaintiffs' claims and allegations regarding notice, it is appropriate to remand for the district court to consider the merits of the Title IX claim and determine whether Plaintiffs could be entitled to nominal or compensatory damages.[5]

---

[5] The merits of Plaintiffs' Title IX claims are rightly a question for the district court in the first instance. In analyzing whether CIAC was on notice that its policy could violate Title IX, however, Judge Menashi's concurring opinion makes a number of statements about the law

\*     \*     \*

The record in this case clearly indicates that Yearwood and Miller

followed every rule in place in Connecticut track and field at the time.  Even the

majority opinion contemplates that any reallocation of titles and placements

would necessarily involve denying Yearwood and Miller *their* titles and

---

regarding inclusion of students who are transgender in schools and sports that merit a response.  *See* Conc. Op. of Menashi, *J.*, at 14-17.  Near-universal authority suggests that Title IX permits or even requires funding recipients to accommodate students who are transgender according to their gender identities.  *See, e.g.*, *A.C. by M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F. 4th 760, 771 (7th Cir. 2023) (finding plaintiffs had demonstrated a likelihood of success on the merits that two school districts' "refusal to grant gender-affirming facility access to the plaintiffs amounts to discrimination on the basis of sex."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) ("Unlike the other boys, [plaintiff] had to use either the girls restroom or a single-stall option.  In that sense, he was treated worse than similarly situated students."), *cert. denied*, 141 S. Ct. 2878 (2021); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1228 (9th Cir. 2020) ("[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity.  Nowhere does the statute explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity."), *cert. denied*, 141 S. Ct. 894; *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018) ("We . . . agree with the School District's position that barring transgender students from restrooms that align with their gender identity would itself pose a potential Title IX violation."), *cert. denied*, 139 S. Ct. 2636 (2019); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1737, 1744 (2020) (interpreting Title VII's identical prohibition of discrimination "on the basis of sex" as prohibiting discrimination on the basis of transgender status).

The Eleventh Circuit stands alone in holding that Title IX does not require school districts to allow students who are transgender to use the bathroom of their choice.  *Adams by and through Kasper v. Sch. Bd. of St. John's Cnty, Florida*, 57 F.4th 791, 812 (11th Cir. 2022).  And even if this court were to adopt the Eleventh Circuit's view of Title IX as it pertains to bathroom use, the Eleventh Circuit's holding in *Adams* would not necessarily affect CIAC's policy in the case before us today.  Holding that a school *need not* accommodate students who are transgender according to their gender identity in order to comply with Title IX is qualitatively different than holding that a school *cannot* do so.

17

placements and could be an overreach of a court's equitable power. However, in my view, Plaintiffs' claim for injunctive relief fails before reaching the question of whether such an injunction would be just and equitable because Plaintiffs request relief that would not redress their alleged injuries and is impossible to grant. For this reason, I would find that Plaintiffs lack standing to pursue their claims for injunctive relief.

The district court now must address complicated questions about the merits of Plaintiffs' Title IX claims, whether damages are available, and whether Defendants were on notice that their policy could be in violation of Title IX. Ensuring that people who are transgender are able to exercise their inalienable rights to life, liberty, and the pursuit of happiness will continue to generate nuanced legal and policy questions. The answers that courts and policymakers come to will not spur universal agreement.

As our country grapples with these questions, the language we use matters deeply, because our choice of words reflects the decency and humanity we extend to people who are transgender.[6] In a recent national survey of

---

[6] In the proceedings below, the district court required Plaintiffs' counsel, as a matter of "civility" and "respect[]," to refrain from referring to Yearwood and Miller as "males" or "male athletes" rather than, for example, "transgender females" or "transgender athletes." *See* App'x

18

transgender and non-binary youth, 64% of all respondents reported being the subject of discrimination due to their gender identity and 27% reported being physically threatened or harmed due to their gender identity. Am. Br. of the Trevor Project at 5-6 (citations omitted). And while the case before us is about high school sports, the discrimination people who are transgender face in our country today certainly does not end at high school graduation. A recent analysis of the National Crime Victimization Survey found that transgender adults are more than four times as likely to be the victims of violent crime as adults who are not transgender. Andrew Flores et al, *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017-2018*, 111 American J. of Pub. Health, no. 4, 2021, at 726.

I bring these statistics up not to suggest that they should weigh on the outcome of this particular case, but to urge all participants in this ongoing

---

104-09. In their brief before the three-judge panel of this Court, Plaintiffs argued that the district court doing so formed a basis for reassignment on remand. The Court today denies that request. *See* Maj. Op. at 10 n.1. The district court did not exhibit bias, prejudge the merits, nor abuse its discretion in requiring counsel to refer to parties consistent with their gender identity. As many other courts have, *see, e.g.*, *Bostock*, 140 S. Ct. 1731 (Gorsuch, J.); *L.W. v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023) (Sutton, C.J.); *Grimm*, 972 F.3d 586 (Floyd, J.), the majority and dissenting opinions of this Court refer to litigants such as Yearwood and Miller consistent with their gender identity.

national discussion to be thoughtful, respectful, and responsible in the words we

choose and the reactions we offer.

21-1365 (en banc)
*Soule ex rel. Stanescu v. Connecticut Association of Schools, Inc.*

MERRIAM, *Circuit Judge*, concurring in part and dissenting in part:

These plaintiffs lack standing to bring a claim for the injunctive relief sought in their complaint. I fully join the thoughtful dissenting opinion as to that issue.

However, given the now-inevitable remand of this case to the District Court, I depart from the dissenting opinion's conclusion that we should affirm the District Court's dismissal of the claims for damages under *Pennhurst*. On remand, I see no reason not to permit the District Court to reconsider its *Pennhurst* holding on a fuller record, in conjunction with any merits determinations it may reach. As the majority opinion recognizes, it is not clear whether the District Court fully understood its discretion to reach the merits of plaintiffs' claims without first considering the *Pennhurst* bar. It is understandable why the District Court may have felt compelled to address the *Pennhurst* bar immediately, once it had concluded (rightly) that plaintiffs lacked standing to seek injunctive relief. But the District Court was not *required* to reach that issue at that time, and it may consider the *Pennhurst* bar at any stage of the litigation. I therefore concur with the majority opinion in that regard.

Although further development of the record may affect the District Court's substantive analysis of the *Pennhurst* bar, I take no position as to what the District Court's ultimate conclusion on that question should be.

CHIN, *Circuit Judge*, dissenting, joined by CARNEY and KAHN, *Circuit Judges*, in full; MERRIAM, *Circuit Judge*, as to Parts I and II; LEE and PÉREZ, *Circuit Judges*, as to Part II; and LOHIER and ROBINSON, *Circuit Judges*, as to Part III:

From 2017 through early 2020, Intervenors Andraya Yearwood and Terry Miller, transgender females, participated in girls' high school track events in Connecticut. They won some events and lost some events, but they always competed in accordance with the applicable rules and policies of the governing body, the Connecticut Interscholastic Athletic Conference (the "CIAC"). Plaintiffs -- four non-transgender female athletes who competed against Yearwood and Miller -- brought this lawsuit seeking, *inter alia*, injunctive relief to "correct" certain athletic records by removing all references to Yearwood and Miller, as if they had never competed. Plaintiffs also sought damages for purported violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").

When Plaintiffs filed suit, their central claim for relief was for an injunction barring transgender girls from competing in CIAC-sponsored girls' sporting events. But with the onset of the pandemic and the resulting cancelled competitions over the following school years, that claim for relief was rendered moot, leaving only the request for injunctive relief "correcting" the records. The

district court dismissed that claim, concluding that Plaintiffs lacked standing to seek an injunction to rewrite the records. The district court also dismissed Plaintiffs' claim for damages. The district court did not reach the merits of the Title IX issue, but held that the damages claim was barred by *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981), reasoning that the CIAC and its member high schools (together, "Defendants") did not have adequate notice that their policy permitting transgender students to participate in athletics consistent with their gender identity (the "Policy") violated Title IX -- even assuming that it did.

The majority vacates and remands, holding that Plaintiffs have pleaded facts sufficient to establish standing for the requested injunctive relief and that the district court erred by not considering the merits of the damages claim "before or in tandem with the question of notice." Maj. Op. at 10.

We respectfully dissent. First, with respect to Plaintiffs' claims for injunctive relief seeking to "correct" the records, we conclude that although Plaintiffs have alleged injury in fact, they have not sufficiently alleged redressability, that is, that their injury will be redressed by the relief sought. The claimed injury -- the denial years ago of an equal opportunity to compete under Title IX -- would not be redressed by an injunction erasing the times and titles

2

achieved by Yearwood and Miller.  Second, with respect to the damages claim, we see no reversible error in the district court's decision to address the *Pennhurst* bar before resolving the more difficult issue of the merits, and we agree that given the uncertain state of the law and government directives endorsing the type of approach they adopted, Defendants did not have notice that the Policy violated Title IX -- again, even assuming that it did.

## I.

In 2013, the CIAC first implemented its Policy permitting students who are transgender to participate in gender-specific athletic competitions consistent with their gender identity, as established in the student's "current school records and daily life activities."  CIAC By-Laws Article IX, Section B.  The Policy was by no means an outlier.  The District of Columbia and fifteen states have similar policies affording transgender students like Yearwood and Miller "equal access to sports participation."  Amicus Br. for States of New York, Hawaii, California, Colorado, Delaware, Illinois, Maine, Massachusetts, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia at 13, 24-26.

3

Plaintiffs Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti brought this action in February 2020, when they were high school seniors (Soule and Mitchell) and sophomores (Smith and Nicoletti), alleging that the Policy violates Title IX. According to Plaintiffs, as a result of the participation of transgender girls in girls' athletic events, "girls and women are losing competitive opportunities, the experience of fair competition, and the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory." App'x at 148.

Despite Plaintiffs' sweeping assertions about opportunities lost to transgender girls, three of the Plaintiffs each alleged *only one race*, over the course of their high school athletic careers, in which competing against transgender girls affected their athletic achievements; one of the Plaintiffs alleged four races. Specifically, the Second Amended Complaint (the "Complaint") alleges that, but for the Policy:

- Mitchell would have placed second in the 2018 State Open Championship Women's Outdoor 100-meter final, first in the 2019 State Open Championship Women's Indoor 55-meter final, first in the 2019 Class S State Championship Women's Outdoor 100-meter final, and third in the 2019 State Open Championship Women's Outdoor Track 200-meter final;

- Nicoletti would have placed seventh in the 2019 Class S State Championship Women's Outdoor 100-meter preliminary race, and advanced to the 100-meter final;

4

- Smith would have placed second in the 2019 State Open Championship Women's Outdoor 200-meter final; and

- Soule would have placed sixth in the 2019 State Open Championship Women's Indoor 55-meter preliminary race, and advanced to the 55-meter final. *See id.* at 154-58 (Tables 10-15 in the Complaint).[1]

The injury Plaintiffs allege is the "denial of equal athletic opportunity and concomitant loss of publicly recognized titles and placements during track and field competitions in which they participated against and finished behind Intervenors" in violation of Title IX. Maj. Op. at 6. Plaintiffs originally requested the following relief: (1) an injunction prohibiting Defendants from enforcing the Policy going forward; (2) an injunction requiring Defendants to "correct any and all records, public or non-public," by removing Yearwood and Miller and giving "credit and/or titles" to the non-transgender girls who had lost to them; (3) an injunction requiring Defendants to "correct any and all records, public or non-public, [by] remov[ing] times achieved by"

---

[1] Smith and Mitchell outperformed Yearwood and Miller on multiple occasions. For example, in the 2019 Combined State Open Championship Women's Outdoor 100-meter final, Mitchell and Smith both outperformed Yearwood and Miller. *Compare* Appellees' Supp. App'x at 68 (showing first-place finish for Mitchell) *with id.* at 83 (showing third-place finish for Smith) *with id.* at 28 (showing fourth-place finish for Yearwood) *and id.* at 41 (showing false start for Miller). In the 2019 Class S Championship Women's Indoor 55-meter final, Mitchell finished second and Yearwood finished in third. *See id.* at 30, 70.

5

Yearwood and Miller; and (4) "[a]n award of nominal and compensatory damages."  App'x at 176.  Because "plaintiffs must demonstrate standing . . . for each form of relief that they seek," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citation omitted), we first address Plaintiffs' standing for their claims for injunctive relief and then turn to Plaintiffs' claims for damages.

## II.

We agree that Plaintiffs have alleged that they have suffered a concrete, particularized, and actual harm -- the denial of equal athletic opportunity under Title IX -- which is sufficient to establish injury in fact.  *See* Maj. Op. at 20-23; *see also* Intervenors' En Banc Br. at 28-29 ("Plaintiffs have alleged an injury in fact because each Plaintiff has identified at least one specific instance in which she allegedly raced against -- and finished behind -- a girl who is transgender.").[2]  Even so, as set forth below, Plaintiffs' claims for injunctive

---

[2]     When this case was argued before the three-judge panel of this Court, Plaintiffs alleged that the Policy deprived them of a "chance to be champions" and that they "feel erased" because their "records fail to appropriately credit female achievements." Appellants' Panel Br. at 18-19.  The panel held that these allegations were insufficient to establish injury in fact because "feel[ing] erased" is not a cognizable Article III injury, and Plaintiffs regularly competed at state track championships where they had the opportunity to compete for state titles and were indeed "champions" on numerous occasions.  After the panel issued its opinion, Plaintiffs' theory of injury evolved.

6

relief are either now moot or fail to satisfy the redressability prong of standing, and therefore dismissal is warranted.

When Plaintiffs first filed this lawsuit in February 2020, they undoubtedly had standing to seek an injunction prohibiting future enforcement of the Policy. At that time, the Policy applied to Plaintiffs, who were high school sophomores and seniors intending to compete in the upcoming Spring 2020 girls' track and field season against Intervenors. Therefore, future injury as a result of the Policy was "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013), and an injunction preventing Defendants from enforcing the Policy would redress that alleged injury. But the COVID-19 pandemic intervened, forcing school closures, and requiring cancellation of the entire spring athletics season. By the time Defendants filed their joint motion to dismiss in August 2020, Mitchell, Soule, Yearwood, and Miller had all graduated from high school. Nicoletti and Smith competed against no transgender athletes in their final years of high school, and they both had graduated before the three-judge panel of this Court heard oral argument in this case. Hence, as Plaintiffs have conceded and as the majority does not dispute, Plaintiffs' principal claim for injunctive relief --

7

an injunction forbidding future enforcement of the Policy -- is decidedly moot.

*See* Maj. Op. at 24 n.3 (citing *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993)).

This leaves, with respect to injunctive relief, only Plaintiffs' requests for injunctions requiring Defendants to "correct" their official athletic records by giving "female athletes" the credit and titles they would have received and "remov[ing]" transgender girls from the records. App'x at 176. According to Plaintiffs, these injunctions, if granted, would remedy their past denial of equal athletic opportunities and related "ongoing harm of a degraded resume" by giving "credit where credit's due." Appellants' En Banc Br. at 29, 38.

We are not convinced, however, that an injunction requiring Defendants to erase the times and titles earned by Intervenors, and to give non-transgender athletes higher placements in past races where Intervenors had finished before them, would redress the alleged injury. The denial of equal athletic opportunity and related public recognition, it seems to us, could be redressed only by either ordering do-overs of the races, which Plaintiffs do not request, or awarding damages, which, as discussed further below, are barred under *Pennhurst* in this action.

8

**A.**

At threshold, a past injury is not redressable by injunctive relief, unless accompanied by allegations of ongoing harm or a likelihood of future harm. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998) ("If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing . . . of any real or immediate threat that the plaintiff will be wronged again. . . . The speculative nature of [plaintiff's] claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled."). Therefore, "[a] plaintiff seeking injunctive or declaratory relief . . . must show a likelihood that he or she will be injured in the future." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004); *see also* Appellants' En Banc Br. at 46.

Next, to satisfy redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by" the relief sought. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks and citation omitted). This is a real and meaningful requirement. *See, e.g., Steel Co.*, 523 U.S.

9

at 107 ("Relief that does not remedy the injury suffered *cannot* bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." (emphasis added)); *cf. United States v. Juvenile Male*, 564 U.S. 932, 937 (2011) (per curiam) (a judgment's "possible, indirect benefit" does not preserve standing). The Supreme Court has recently emphasized this point:

> But redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power. . . . Otherwise, redressability would be satisfied whenever a decision might persuade actors who are not before the court -- contrary to Article III's strict prohibition on issuing advisory opinions.

*Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (internal quotation marks and citations omitted, alterations adopted, and emphasis removed).

Finally, as relevant here, a court's favorable decision that merely bestows "psychic satisfaction" upon a plaintiff fails to satisfy redressability. *See Steel Co.*, 523 U.S. at 107 (noting that "psychic satisfaction is not an acceptable Article III remedy"); *Kapur v. Fed. Commc'ns Comm'n*, 991 F.3d 193, 196 (D.C. Cir. 2021) ("The 'psychic satisfaction' of winning doesn't cut it."); *I.L. v. Alabama*, 739 F.3d 1273, 1281 (11th Cir. 2014) ("[G]ranting the plaintiffs the relief they request would result in nothing more than a mere 'moral' victory, something the federal

courts may not properly provide."); *Doyle v. Town of Litchfield*, 372 F. Supp. 2d

288, 303 (D. Conn. 2005) ("[S]ome emotional or mental satisfaction . . . is

inadequate to confer standing, no matter how worthy the cause.").

**B.**

Applying these constitutional principles here, to establish standing

for the requested injunctions to "correct" athletic records, Plaintiffs must

adequately allege either ongoing harm or a likelihood of future harm resulting

from the alleged Title IX violation, *and* that this ongoing or future injury is likely

to be redressed by the requested relief.  Plaintiffs fail to meet this burden.

Plaintiffs' requested injunctions for amending Defendants' records

sweep broadly, seeking the removal of "*any and all*" times, titles, and records

achieved by transgender girls -- irrespective of whether those records have any

bearing on Plaintiffs' own athletic achievements.  *See* App'x at 176 (emphasis

added).  Even the majority recognizes that Plaintiffs go too far in the relief they

request.  *See* Maj. Op. at 32-33.  Indeed, an order requiring Defendants to remove

record times and titles achieved by transgender girls that have *no impact* on

Plaintiffs' own athletic achievements would at most afford Plaintiffs "psychic

satisfaction," and remedy no actual injury of Plaintiffs.  This is insufficient to

11

establish standing here. Plaintiffs cannot plausibly allege that they were personally denied equal athletic opportunities in races where they did not finish behind a girl who is transgender, and, therefore, there is no ongoing or likelihood of future harm to Plaintiffs from maintaining the records related to these races as is. Ordering Defendants to excise the achievements of transgender girls in races where Plaintiffs finished ahead of, or did not compete against, a transgender athlete would redress no concrete, particularized, or actual injury suffered by Plaintiffs. This purported injury is thus insufficient to establish standing. *See Steel Co.*, 523 U.S. at 107.

We reach the same conclusion for the records related to races where Plaintiffs themselves placed behind or lost to a girl who is transgender. As mentioned, Nicoletti, Soule, and Smith each allege *one* track event in their high school careers where, "[b]ut for" Intervenors' participation, they would have placed higher than they did.[3] Mitchell alleges *four* final championship races where "[b]ut for" Intervenors' participation, Mitchell would have been the third,

---

[3] Specifically, Nicoletti alleges she would have placed seventh instead of ninth in a preliminary championship race; Soule alleges she would have placed sixth instead of eighth in a preliminary championship race; and Smith alleges she would have placed second instead of third in a final championship race. App'x at 154-59.

12

second, or first place finisher. *See* App'x at 154-58. Plaintiffs argue that they continue to suffer ongoing harms from these seven past denials of equal athletic opportunity, urging specifically that their "downgrade[d]" athletic records impact their future employment prospects and result in a lack of public recognition for "their hard-earned athletic accomplishments." Appellants' En Banc Br. at 36-37 (citing App'x at 172).[4] But Plaintiffs fail to show how "correcting" the records of these seven high school events that occurred in 2018 and 2019 is likely to redress either of these harms, even partially.

Although Plaintiffs admit that "it is too late for" an injunction to "correct" the records to have any effect on their opportunities for college recruitment and scholarships, they argue that the current records "will *always* impact" their future employment opportunities. *Id.* at 37. Setting aside the issue that the Complaint is devoid of allegations regarding employment, Plaintiffs

---

[4]     Plaintiffs also assert that they suffer ongoing "stress, anxiety, intimidation, and emotional and psychological distress" from the alleged Title IX violations in 2018 and 2019. Appellants' En Banc Br. at 28. Emotional distress of this variety is not a cognizable injury in fact. *See Santos v. Dist. Council of N.Y.C. & Vicinity of United Brotherhood of Carpenters & Joiners of Am., AFL-CIO*, 547 F.2d 197, 200 (2d Cir. 1977) (explaining that "disappointment" in election results is "an emotional loss insufficient to establish standing" (internal quotation marks and citation omitted)); *see also Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 619-20 (2007) (Scalia, *J.*, concurring) (explaining that "[p]sychic [i]njury" that consists of an individual's "mental displeasure" is insufficiently "concrete and particularized" to confer standing).

13

have consistently presented nothing other than speculation that "correcting" the records would have any effect in this arena. It strikes us as pure speculation that changing Plaintiffs' placements in one high school race (or four races in Mitchell's case) would affect a prospective employer's decision to hire any one of them in the future. And the reality is that no prospective employers would be bound by an injunction issued in this case to overlook the current records, which reflect the outcomes of the races as they were run. Therefore, even if Mitchell were, for example, to change her two second-place finishes on her resume to be first-place finishes, whether this change would improve her employment opportunities "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562. Under these circumstances, a court can only speculate as to how prospective employers might exercise their discretion in hiring. This is insufficient to satisfy redressability. *See id.* at 561.

It is conceivable that, if Plaintiffs' requested injunction is granted, some prospective employer, at some undetermined point in the future, *could* be persuaded to interview or hire one of the Plaintiffs because of her belated higher

14

placement in a race she had lost to Yearwood and Miller years ago.

Redressability, however, is not "satisfied whenever a decision *might persuade* actors who are not before the court." *Haaland*, 599 U.S. at 294 (emphasis added). Moreover, the likelihood that Plaintiffs' higher placements would impact their employment prospects in this way is minimized by the fact that any hiring decisions would be made years after Plaintiffs' high school athletic careers ended. After all, as collegiate runners, Plaintiffs have only added to their already impressive athletic records.[5] College-level sports are generally considered to be much more elite and competitive than high school sports, and teams are likely to be significantly more selective: in fact, only 6.2% of girls who compete in high school track and field across the country go on to run at the collegiate level.[6] Therefore, it is entirely speculative, if not highly implausible, that Plaintiffs' placement in any one high school race years ago -- as opposed to the totality of their more recent and more impressive college records -- would have an impact on Plaintiffs' future employment opportunities.

---

[5] All four Plaintiffs currently compete on collegiate track-and-field teams. Some were awarded scholarships. By contrast, Yearwood and Miller have not participated in athletics or competed since high school. *See* En Banc Transcript at 72.

[6] *See Estimated probability of competing in college athletics*, NCAA (Apr. 8, 2020), https://www.ncaa.org/sports/2015/3/2/estimated-probability-of-competing-in-college-athletics.aspx [https://perma.cc/H2SC-YZNH].

We are left, then, with Plaintiffs' allegedly ongoing lack of public recognition for their athletic achievements as the remaining basis to support standing for their claims for injunctive relief. According to the majority, Plaintiffs have standing for an injunction to "correct" public records for the seven races where Plaintiffs finished behind Intervenors because such relief "*could at least* provide [them] with the publicly recognized titles and placements they would have received if Intervenors had not competed and finished ahead of Plaintiffs in specific races," Maj. Op. at 7 (emphasis added), "albeit belatedly," *id.* at 27. This argument also rests on speculation.

As alleged in the Complaint, the lack of public recognition is not an ongoing harm that is redressable by an Article III court. What does "belated" public recognition mean in this case? The majority does not say. Nor does the majority recognize that Plaintiffs' high school athletic records, as they currently exist, *do* give them public recognition for their achievements in races that were run in conformity with the rules in effect at the time. For example, the current records provide that Mitchell was the third-place finisher in the 2019 State Open Championship Women's Indoor 55-meter final and the second-place finisher in the 2019 Class S State Championship Women's Outdoor 100-meter final. App'x

16

at 155, 158. Plaintiffs do not allege that these records fail to reflect that they won according to the rules in place at the time. Rather, Plaintiffs allege that they would have won or placed higher if the rules had been different, and that if an injunction were now to be issued, retroactively changing the rules of the game, they would somehow receive measurably greater public recognition and their reputations would be further enhanced.[7] These allegations, too, are purely speculative. An injunction "correcting" the records to reflect an alternate universe according to how Plaintiffs say they would have competed in seven races had the rules been different would give Plaintiffs nothing more than the satisfaction of a judicial decision vindicating their position that the Policy violates Title IX. But, as counsel for Plaintiffs conceded, *see* En Banc Transcript at 7, achieving "psychic satisfaction is not an acceptable Article III remedy," *Steel Co.*, 523 U.S. at 107. While we do not take the position that psychic relief can never be sufficient to confer standing, here, where the injunction seeks merely to

---

[7]      Although in particular cases both types of relief may be warranted, damages generally provide adequate and appropriate redress for claims of past reputational injury. *See, e.g.*, *TransUnion*, 141 S. Ct. at 2210-13 (holding that plaintiffs who were erroneously identified by credit reporting agency to potential creditors as being on a government "terrorist list" suffered concrete injury of "reputational harm" and have standing to seek retrospective damages); *Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276, 289 (2d Cir. 2023) (holding that risk of harm caused by public disclosure of private information is redressable with retrospective damages).

17

remedy a past injury by giving "credit where credit's due" and the claim is principally for Plaintiffs' moral or emotional satisfaction, it is not sufficient. *Id.*; *Kapur*, 991 F.3d at 196; *I.L.*, 739 F.3d at 1281; *see also Lyons*, 461 U.S. at 107 n.8 ("The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant. Of course, emotional upset is a relevant consideration in a damages action.").

Had Plaintiffs adequately alleged a non-speculative ongoing or future harm resulting from the past denial of equal athletic opportunity, our standing analysis would be different. The circumstances here are distinguishable from, for example, those of a law student who, as a result of sex or racial discrimination, was downgraded from receiving a "magna cum laude" designation to "cum laude" only. *See* En Banc Transcript at 6-7. There is no question that an injunction to reallocate Latin honors that were illegally bestowed upon a law school graduate would provide more than "psychic satisfaction" to the injured individual. Such an injunction is likely to redress a non-speculative and ongoing or future harm by directly improving employment prospects or earning capacities in a field of study. The link, however, between

18

improved employment opportunities after college graduation and finishing first

instead of third in a high school track race held years earlier is much more

attenuated -- if it exists at all.

The majority acknowledges that "Plaintiffs do not have standing to

seek remedies for generalized grievances about the [] Policy," Maj. Op. at 31, but

the record leaves no doubt that Plaintiffs are indeed waging a generalized

campaign in federal court against transgender athletes.[8]  Indeed, the majority

---

[8]     That Plaintiffs brought this case to pursue generalized grievances is evident from the language they use throughout the Complaint.  Plaintiffs refer to themselves as "girls" and "female athletes," App'x at 164, but refer to Intervenors as "student[s] born male," *id.* at 133; "biological males," *id.* at 164; and "athletes born male and with male bodies," *id.* at 176.  Notably, in the district court Plaintiffs moved to disqualify the district judge after he ordered them to stop referring to Intervenors as "males."  In his order denying the motion, the district judge observed that Plaintiffs' use of "males" in this respect was "needlessly provocative" and not necessary to advance Plaintiffs' position.  In our dissent, we refer to Intervenors as "transgender females" and "transgender girls."  We do so to afford them the respect and dignity they are due as litigants in our Court.  Because a transgender person's gender identity is what some "would think of as opposite to their assigned sex," *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), *as amended* (Aug. 28, 2020), calling attention to a transgender person's biological sex by referring to them as a "biological male" is harmful and invalidating.  *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons:  An Endocrine Society Clinical Practice Guideline*, 102(11) J. Clinical Endocrinology & Metabolism 3869, 3875 tbl.1 (2017) (observing, "[a]s [the physical aspects of maleness and femaleness] may not be in line with each other . . . the terms biological sex and biological male or female are imprecise and should be avoided").  Research indicates that misgendering -- referring to the gender of a person incorrectly -- can cause or exacerbate feelings of stigmatization, stress, and depression. *See* Sabra L. Katz-Wise, *Misgendering:  What it is and why it matters*, Harvard Health

19

implicitly acknowledges as much by, *inter alia*, purporting to limit Plaintiffs' standing to seek an injunction to "correct" public -- as opposed to private -- athletic records only. "Correcting" private records, according to the majority, would afford Plaintiffs only "psychic satisfaction." *Id.* at 32-33 (citing *Steel Co.*, 523 U.S. at 107). Implicit in the majority's distinction between private and public records is the recognition that an injunction to "correct" the records *cannot* remedy Plaintiffs' past denial of equal athletic opportunities and is effective only for providing "some" additional public recognition to Plaintiffs. Because private athletic records do not give public recognition, the majority is forced to draw the line there. If this case were genuinely about redressing Plaintiffs' alleged past denial of equal athletic opportunities, there would be no distinction between public and private records -- there would be only damages. Instead, the majority accepts Plaintiffs' invitation to be not an arbiter of justiciable disputes but a dispenser of public acclaim.

---

Publishing, Harvard Medical School (July 23, 2021), https://www.health.harvard.edu/blog/misgendering-what-it-is-and-why-it-matters-202107232553 [https://perma.cc/F8Q3-AP39]; *see also* Kevin A. McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3 Stigma and Health 1, 53-64 (2018). For transgender people, the experience of being misgendered -- whether intentionally or negligently -- harms their "deeply felt, inherent sense" of gender, a core part of what makes each of us human. *Grimm*, 972 F.3d at 594.

There is no case, to our knowledge, where a court has held that a plaintiff had standing for a claim for injunctive relief and the *only* redress a court's favorable decision could bestow came in the form of public recognition. *But cf. Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 134-35, 140 (1951) (holding that plaintiff had standing for an injunction striking its name from a public list of organizations designated by the Attorney General as Communist because plaintiff alleged that the designation was erroneous and that it resulted in a laundry list of ongoing harms -- including "a multiplicity of administrative proceedings . . . to rescind licenses, franchises, or tax exemptions," and the resignation or withdrawal of its members). Moreover, unlike the cases from our sister circuits holding that a plaintiff continued to have standing to seek relief from an athletic association's attempts to vacate or expunge their athletic records, Plaintiffs here do not allege any such future threat to their records. *Cf. e.g.*, *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *Crane by Crane v. Indiana High Sch. Athletic Ass'n*, 975 F.2d 1315, 1318 (7th Cir. 1992); *Wiley v. Nat'l Collegiate Athletic Ass'n*, 612 F.2d 473, 476 (10th Cir. 1979). Plaintiffs' reliance on these cases is ill-placed; rather, it is Intervenors who, due to this lawsuit, "have an interest in preventing" the "erasure of" their

individual records.[9] *Sandison*, 64 F.3d at 1030.  Indeed, in the absence of any plausible, non-speculative allegations of ongoing or future harm, Plaintiffs' remaining claims for injunctive relief are fundamentally retrospective -- seeking to remedy the past denial of equal athletic opportunities -- and therefore, if they have a meritorious claim, the proper remedy is damages.  *See Lyons*, 461 U.S. at 111.

Even assuming that the redressability requirement were met, other considerations warrant our caution in ultimately awarding such injunctive relief, particularly when there is no dispute that Plaintiffs' claims for damages -- if sustained -- would redress the alleged harm.  *Cf. Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (stating that, given First Amendment considerations, injunctive relief will not usually be granted to enjoin a libel or slander and that, ordinarily, the only remedy for

---

[9]     In her concurrence, our colleague Judge Nathan writes, "it is not surprising that [Intervenors'] own lawyers suggested at oral argument" that Plaintiffs have standing. Nathan, *J.*, Concurrence at 4 (citing Oral Arg. Tr. at 63-64, 66, 68-69, 71-72).  We do not understand counsel to have made any such suggestion.  For instance, at oral argument, Intervenors' counsel simply noted that the availability of a remedy presented a "redressability question," but this statement does not "suggest[]" that Plaintiffs had standing with respect to the remaining claim for an injunction rewriting the records.  In the same exchange, counsel reiterated Intervenors' position that this case should "be resolved on a 12(b)(6) motion for failure to state a claim."

defamation is an action for damages). "Correcting" the records as Plaintiffs request would require stripping Yearwood and Miller of the athletic achievements earned by them when, at all times relevant, they were eligible competitors and competed in full compliance with all applicable and existing CIAC rules.

Plaintiffs assert that "the reallocation of records and medals" is "commonplace," Appellants' En Banc Br. at 51, and point to the practice of various sports governing bodies withdrawing awards previously bestowed on certain athletes who were determined to have been ineligible to compete under the (unamended) governing rules. In none of these examples, however, did the governing bodies grant the precise relief Plaintiffs seek here. Plaintiffs have not, and cannot, point to a sports governing body that retroactively stripped an athlete of accomplishments where the athlete did not cheat or take an illegal substance, but instead complied with all the then-existing rules. Even assuming that Plaintiffs are right on the merits and the Policy violates Title IX, it is unprecedented to retroactively change the ground rules of individual local competitions, such that certain competitors will be deemed ineligible only after the fact, and then, to take it even further, to strip those competitors of their duly

23

earned achievements based on a late-developing interpretation of a federal statute. It is not the business of the federal courts to grant such relief.

To be sure, whether a plaintiff is ultimately entitled to the relief she seeks goes to the merits of her claims and does not control the threshold jurisdictional question of whether she can maintain her claims in an Article III court. *See E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 461 (2d Cir. 2014); *see also Chafin v. Chafin*, 568 U.S. 165, 174 (2013). But we do not assert that an injunction "correcting" the records is legally unavailable to Plaintiffs -- we simply acknowledge that granting the requested relief would require taking something away from third parties, who, as Plaintiffs admit, "haven't done anything wrong." En Banc Transcript at 8. Moreover, the redressability requirement of standing requires consideration of whether the relief sought is "an acceptable Article III remedy," *Steel Co.*, 523 U.S. at 107, and thus "the linkage of justiciability doctrine to concerns about necessary and acceptable remedies is evident on the face of the 'redressability' prong of the standing test." Richard H. Fallon, Jr., *The Linkage Between Justiciability and Remedies -- and Their Connections to Substantive Rights*, 92 Va. L. Rev. 633, 670 (2006). Although "[r]edressability does not permit us to wade so deeply into the merits," *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405

(2d Cir. 2011), "there should be no categorial resistance to courts allowing judgments about necessary and unacceptable remedies to influence their framing of justiciability rules," Fallon, 92 Va. L. Rev. at 692.  Here, the balance of the equities does not raise an issue of redressability on its own, but it triggers a need for special caution in assessing redressability, and reaffirms that the preferable remedy in a case such as this is the more traditional one of monetary relief, notwithstanding a court's de facto power to enter an order changing the records if the circumstances warranted.

Accordingly, in the circumstances presented here, we are not persuaded that striking Yearwood's and Miller's records would meaningfully redress Plaintiffs' alleged past injury of a denial of equal athletic opportunities and related public recognition.[10]

---

[10]     In support of its standing analysis, the majority contends that "if the facts were reversed and an athletic conference decided to categorize transgender girl athletes as boys," the transgender girls would have standing to bring a Title IX claim.  Maj. Op. at 7.  The majority also asserts that our standing analysis "would leave the transgender girl athletes [in a reversed hypothetical] without standing to seek alteration of existing athletic records consistent with their athletic achievement."  *Id.* at 29 n.6.  We are unclear as to what the majority means by a reversed hypothetical.  If transgender girls were barred from racing in girls' races, they surely would have standing to sue for damages and to seek injunctive relief with respect to the policy (as long as their claims were not moot).  But there would be no basis for an injunction to alter existing records if they had not been permitted to run in the first place.  If the majority has in mind a situation where transgender girls were permitted to run in races and the athletic conference then

25

## III.

As discussed, an award of monetary damages, even in nominal amounts, would redress Plaintiffs' alleged injury of a denial of equal athletic opportunities.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (where plaintiff's legal rights were violated and he could not or would not quantify his injury in economic terms, for "purpose[s] of Article III standing, nominal damages provide the necessary redress").   We would, however, affirm the district court's holding that monetary relief is unavailable in this case by virtue of *Pennhurst*.

Congress enacted Title IX pursuant to its authority under the Spending Clause.  *See* Maj. Op. at 37.  *Pennhurst* imposes a limit on this power,

---

changed course and struck their results from the records, they would also likely lack standing to sue to reinstate their results years later unless they could allege a non-speculative ongoing or future injury resulting from the athletic conference's actions. The nature of the injury in the latter scenario (unlikely as it may be) would be substantially different from the injury at issue in the present case, for the transgender girls would be seeking not just to alter records to move up in the race results, but to rectify the complete elimination of their athletic achievements from the records.  If, finally, the majority contemplates a scenario where transgender girls are permitted to race but are grouped with non-transgender boys in the results, that too would present an injury of a different kind than Plaintiffs' here.  The majority's "shoe on the other foot" hypothetical, Maj. Op. at 28, overlooks the fact that in that case, transgender girls would have standing based on an *ongoing* injury caused by being misgendered in public records of past races.  In contrast, Plaintiffs here were never prevented from competing and do not claim that the records are inaccurate as to their gender identity.

26

"requir[ing] Congress to speak *unambiguously* in imposing conditions" on States when they accept "federal grant money." *State of New York v. U.S. Dep't of Just.*, 964 F.3d 150, 153 (2d Cir. 2020) (citation and quotation marks omitted). When Congress fails to "speak unambiguously," liability cannot be imposed on a federal funding recipient for violating the Spending Clause statute. *Id.*

The majority faults the district court for dismissing Plaintiffs' claims for monetary relief pursuant to the *Pennhurst* bar before addressing the merits of the Title IX claim. We address first the issue of "*Pennhurst* sequencing" -- that is, whether courts must consider the merits before reaching the *Pennhurst* bar. Finding that neither the Supreme Court nor this Court has recognized any such requirement, we then turn to the district court's application of the *Pennhurst* bar in this case.

**A.**

Contrary to the majority's view, the district court did not conclude "that it was *required* to resolve," Maj. Op. at 9, or "that it *must* resolve the question of [*Pennhurst*] notice before reaching the merits of Plaintiffs' Title IX claims," *id.* at 37 (emphasis added). The district court made no such ruling. The majority's erroneous conclusion rests entirely on a footnote in the district court's opinion:

27

> Plaintiffs argue that the question of notice should be deferred until a later stage of the case. However, if the plaintiffs' claims for money damages are barred due to lack of adequate notice, the action is subject to dismissal in its entirety because the only remaining form of relief sought in this case – attorney's fees and expenses -- is 'insufficient, standing alone, to sustain jurisdiction.'

*Soule by Stanescu v. Conn. Ass'n of Schs., Inc.*, No. 3:20-CV-00201 (RNC), 2021 WL 1617206, at *8 n.13 (D. Conn. Apr. 25, 2021) (quoting *Cook*, 992 F.2d at 19). From this footnote, the majority surmises that it is "apparent" that the district court thought that it "lacked discretion to reach the merits of Plaintiffs' claims without first determining if monetary damages would be available under *Pennhurst*." Maj. Op. at 39.

It is true that the district court, in this footnote, adverted to the possible need for dismissal of the action "in its entirety" and mentioned jurisdiction. It did so cursorily, however, without any analysis, and only in response to Plaintiffs' request that it "*should*" defer consideration of the *Pennhurst* issue. 2021 WL 1617206, at *8 n.13 (emphasis added). But nowhere in its lengthy discussion of *Pennhurst* does the district court note, or even suggest, that it believed it was *required* to decide the notice question first or that it lacked the discretion to consider Plaintiffs' claims for monetary relief on the merits. Rather, notwithstanding the footnote, we think the better reading of the district court's

28

opinion is that it exercised its discretion by choosing to determine the *Pennhurst*

bar first. Its discussion of the sequencing issue, in tone and substance, took the

posture of an aside or afterthought. Moreover, in briefing the motion to dismiss

in the district court, no party suggested that the district court was *required* to

decide the *Pennhurst* issue first. Indeed, in moving to dismiss, Defendants

addressed the merits first and the *Pennhurst* bar second. The structure and

language of the briefing below made clear that, in the parties' view, the district

court was free to address the merits first if it was so inclined.[11] Instead, it

exercised its discretion to address the *Pennhurst* issue first.

In this context, we cannot conclude that the district court erred in

doing so. After dismissing Plaintiffs' claims for injunctive relief for mootness

and lack of standing, *see Soule*, 2021 WL 1617206, at *4-8, only Plaintiffs' claims

for damages and attorneys' fees and costs remained. Therefore, the district court

correctly concluded that, if *Pennhurst* provided a defense against Plaintiffs'

---

[11] Defendants addressed the damages claim in Point III of their memorandum of law, which contained four sub-points. The first three subpoints argued that Plaintiffs had failed to allege a plausible claim for a violation of Title IX, and only in the fourth sub-point did they raise the *Pennhurst* bar. Moreover, sub-point D begins by arguing that "[a]t a minimum," the damages claim was barred by *Pennhurst*. And in their memorandum in opposition to Defendants' motion to dismiss, Plaintiffs argued, with respect to the *Pennhurst* issue, that "debates about *proper* relief are for a later day, not a basis for dismissal." Dist. Ct. Doc. 154 at 53.

claims for damages, then Plaintiffs could not win any of the relief they requested, and the request for attorneys' fees and expenses would not provide a basis for the court to adjudicate the merits of Plaintiffs' Title IX claim. *See id.* at *8 n.13.[12] The district court surely did not abuse its discretion in refraining from deciding more than was necessary to resolve Defendants' motion to dismiss. *See Morse v. Frederick*, 551 U.S. 393, 431 (2007) (Breyer, *J.*, concurring in part and dissenting in part) ("[I]f it is not necessary to decide more, it is necessary not to decide more." (citation and quotation marks omitted)).

To be sure, when "questions are 'indispensably necessary' to resolving the case at hand, 'the court must meet and decide them.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 375 (2010) (Roberts, *C.J.*, concurring) (quoting *Ex parte Randolph*, 20 F. Cas. 242, 254 (Cir. Ct. Va. 1833) (Marshall, *C.J.*)). Even the majority recognizes that the district court did not abdicate its duty to resolve a question that was indispensably necessary to this case; the majority

---

[12]     The district court was merely observing that, once the other claims were dismissed, Plaintiffs' request for attorneys' fees and expenses could not provide a basis for it to reach the merits because "such fees are available only to a party that 'prevails' by winning the relief it seeks." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990); *see also Uzuegbunam*, 141 S. Ct. at 801 ("[T]hose awards are merely a 'byproduct' of a suit that already succeeded[.]" (citation omitted)).

asserts only that "there are strong reasons for addressing the merits first."  Maj. Op. at 41.  None of the majority's "strong reasons," however, lead to the determination that, in this case, the district court was *required* to adjudicate the merits of Plaintiffs' claims before addressing *Pennhurst*.  In fact, Intervenors conceded at oral argument that there is nothing prohibiting a court from dealing with the *Pennhurst* issue before the merits issue -- only that doing so in this instance is "a little bit awkward."  En Banc Transcript at 58.  Appellate courts do not vacate the reasoned judgments of experienced district judges on the basis of "awkwardness" -- there must be an identified error in the district court's holding or an abuse of its discretion to support vacatur.  Apart from its overreading of a remark in footnote 13, the majority points to neither.

A review of *Pennhurst*'s progeny confirms that no precedential authority *requires* that a court in our Circuit reach the merits of a Title IX claim in tandem with, or prior to, the question of notice.  The Supreme Court has, at various times, addressed (1) the merits before notice, (2) the merits together with notice, and (3) notice without reaching the merits at all.  For example, in *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 178-83 (2005), the Court addressed first whether retaliation falls within the Title IX's prohibition of intentional

discrimination on the basis of sex, and then considered whether the recipient had notice that it could be liable for damages with respect to claims of retaliation. But *Jackson* is an outlier.  In two earlier cases -- both of which held that *Pennhurst* does not bar damages where a funding recipient was deliberately indifferent to known acts of sexual harassment -- the Supreme Court integrated the *Pennhurst* notice and Title IX merits inquiries.  *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74-75 (1992) (stating, in one paragraph, that *Pennhurst* is inapplicable and that "[u]nquestionably, Title IX placed on the [school district] the duty not to discriminate on the basis of sex" by permitting teacher-on-student harassment in its schools); *see also Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643-44 (1999) (concluding that "deliberate indifference to known acts of harassment . . . amounts to an intentional violation of Title IX, capable of supporting a private damages action, [even] when the harasser is a student" because the "regulatory scheme surrounding Title IX" and common law have "long provided funding recipients with notice that they may be liable for their failure to respond to the discriminatory acts of certain nonagents").  Finally, in certain cases involving other Spending Clause legislation akin to Title IX, the Supreme Court has addressed only the *Pennhurst* notice issue, making no

32

determination as to the merits of the plaintiff's claims. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 222-23, *reh'g denied*, 142 S. Ct. 2853 (2022) (concluding that recipients lacked the requisite notice that they could face liability for emotional distress damages for violating Spending Clause statutes); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 300 (2006) (holding that the fee-shifting provision of the Individuals with Disabilities Education Act, a Spending Clause statute, fails to furnish "clear notice" that a funding recipient could face liability to a prevailing parent for the cost of services rendered by experts).

Moreover, some of our sister circuits have considered first whether the *Pennhurst* bar applies to a claim brought under Title IX before turning to the merits of the claim. *See, e.g.*, *Hall v. Millersville Univ.*, 22 F.4th 397, 403 (3d Cir. 2022) ("The first issue we must address is whether, as a matter of law, [the funding recipient] could not be held liable under Title IX because it lacked notice that its deliberate indifference to sexual harassment perpetrated by a non-student guest could result in Title IX liability."); *cf. Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 921-22 (7th Cir. 2012) (requesting supplemental briefing on the *Pennhurst* notice question and addressing the merits of plaintiffs' claim that

sport-specific scheduling disparities violated Title IX only after holding the

*Pennhurst* defense to be waived). Others, like the district court here, have

applied *Pennhurst* to bar claims for damages without ever reaching the merits.

*See, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 277

(6th Cir. 2009) (en banc) (concluding that the No Child Left Behind Act "fails the

Spending Clause inquiry because it does not provide clear notice to States that

they must incur the costs of compliance" without resolving an issue of statutory

interpretation central to the merits of plaintiffs' claims); *Rendelman v. Rouse*, 569

F.3d 182, 188-89 (4th Cir. 2009) ("When Congress desires to impose a condition

under the spending clause, it is Congress' burden to affirmatively impose the

condition in clear and unmistakable statutory terms. We conclude therefore that

. . . Congress did not signal with sufficient clarity an intent to subject such a

person to an individual capacity damages claim under [the statute]." (internal

citations and marks omitted) (alterations adopted)).

Indeed, it *makes sense* that a district court would have discretion to

choose whether to address the merits of a claim first, or to determine whether

*Pennhurst* would bar the claim irrespective of its merit. As the majority puts it,

*Pennhurst* "is a mere defense to [damages] liability," Maj. Op. at 43 (citations and

34

quotation marks omitted), and it should be treated as such.  Generally, a district court may choose to decide a defense that legally defeats a claim for relief, raised in a pre-answer motion to dismiss, "if the defense appears on the face of the complaint."  *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (statute of limitations); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (qualified immunity); *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (res judicata).  Had the district court dismissed Plaintiffs' claims for damages pursuant to another defense appropriately asserted in a Rule 12(b)(6) motion  -- such as for failure to comply with a statute of limitations or res judicata -- this Court would not vacate and remand on the ground that the district court *should* have adjudicated the merits of the claim before determining whether the asserted defense was applicable.  Indeed, it behooves any court to avoid such inefficiency.

So too here.  It was more efficient for the district court to address the *Pennhurst* issue first.  Because the law was unsettled as to whether the Policy violates Title IX, the issue of notice -- that is, the lack thereof -- provided a simpler, yet sufficient way for deciding the damages claim in this case, obviating the need to definitively resolve the more complicated merits question.

35

The majority raises the concern that "[i]f courts skip ahead to ask whether damages will be available under *Pennhurst*, then there may be fewer opportunities for Title IX law to develop on the merits in suits seeking only monetary relief," noting that "plaintiffs do not always -- and sometimes cannot -- bring and sustain injunctive claims." Maj. Op. at 43 & n.8. Apart from citing to no authority to support these assertions, the majority ignores the fact that claims for injunctive relief were asserted in nearly all the cases cited in the majority's section on *Pennhurst*. *See* Maj. Op. at 36-43; *see also Cummings*, 596 U.S. at 217 ("In her complaint, [plaintiff] sought declaratory relief, an injunction, and damages."); Amended Complaint, at 3, *Jackson v. Birmingham Bd. of Educ.*, No. 2:01-CV-01866 (KOB), 2002 WL 32668124 (N.D. Ala. Feb. 25, 2002) (seeking damages and "a permanent injunction enjoining the defendant . . . from continuing to violate Title IX"); *Davis*, 526 U.S. at 632 (noting that plaintiff's complaint included a "claim for monetary and injunctive relief under Title IX"); *Pennhurst*, 451 U.S. at 6 ("In addition to seeking injunctive and monetary relief, the complaint urged . . . ."); *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 962 (9th Cir. 2010) ("The plaintiffs sought damages and injunctive relief under Title IX . . . ."); *cf. Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 658-59 (1985) (seeking judicial review and

36

reversal of a final agency decision).[13] Moreover, Title IX law will continue to

develop, irrespective of when courts choose to invoke *Pennhurst*, so long as

plaintiffs continue to assert claims for injunctive relief.[14]

In sum, the district court did not err or abuse its discretion here; it

did not hold that it was required to resolve the question of notice before reaching

the merits. Nor was the court prohibited from dismissing Plaintiffs' claims for

monetary damages based on *Pennhurst* without addressing the merits. Rather,

the district court logically elected, in its discretion, to address whether the CIAC

lacked the requisite notice, rather than first addressing the merits of the Title IX

claim. For these reasons, the majority's "basis" for vacating the district court's

*Pennhurst* holding is no basis at all. Maj. Op. at 42 n.7.[15]

---

[13]     *Franklin* and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), are the only cases cited by the majority without claims for injunctive relief. Both dealt with allegations of sexual harassment, but only *Franklin* held that the funding recipient's conduct violated Title IX. *See Franklin*, 503 U.S. at 74-76; *Gebser*, 524 U.S. at 292.

[14]     It is undisputed that the district court in this case would have had to resolve the merits question if Plaintiffs' claim for an injunction to enjoin the Policy had not become moot. The anomaly of the pandemic and its impact on Plaintiffs' standing for injunctive relief allowed the district court to dismiss Plaintiffs' Title IX claim without reaching the merits. Accordingly, nothing about the approach adopted by the district court elevates *Pennhurst* from a defense to damages liability to a kind of qualified immunity.

[15]     The majority also suggests that both Plaintiffs and Intervenors "advocated" for remand. Maj. Op. at 17. Not so. In their *en banc* brief, Intervenors argued for affirmance, Intervenors' En Banc Br. at 4, and at oral argument, when asked whether the *en banc* Court should decide the merits or remand for the district court to do so, counsel

37

**B.**

Next, we consider whether the district court appropriately dismissed Plaintiffs' claims for monetary damages because Defendants lacked notice that the Policy violates Title IX. In light of the lack clarity in the law, we find that the requisite notice was lacking, and, therefore, we would affirm the district court's dismissal on the ground that *Pennhurst* bars Plaintiffs' damages claims.

A funding recipient's liability for violating Title IX depends, in part, on whether its violation was "unintentional" or "intentional." *Gebser*, 524 U.S. at 287. Liability also depends on notice -- because Title IX is legislation enacted pursuant to Congress's authority under the Spending Clause, "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis*, 526 U.S. at 640; *accord Gebser*, 524 U.S. at 287 ("Our central concern . . . is with ensuring that 'the receiving entity of federal funds [has] notice that it will be liable for a monetary award.'") (citation omitted). As the Supreme Court explained,

> legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States

---

for Intervenors merely stated "either course of action would be perfectly appropriate." Oral Arg. Tr. at 60-61.

38

> agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so *unambiguously*.

*Pennhurst*, 451 U.S. at 17 (citations omitted) (emphasis added). Accordingly, if the funding recipient lacks notice that it could be held liable for certain conduct, or if the funding recipient unintentionally violates Title IX, *Pennhurst* would bar a plaintiff's private damages action under Title IX. *See also Franklin*, 503 U.S. at 74 ("The point of not permitting monetary damages for an unintentional violation [of Title IX] is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award.").

Pennhurst's notice requirement, however, "does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis*, 526 U.S. at 642. This is because the plain terms of Title IX place a duty on a funding recipient to not discriminate intentionally on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance[.]").  "Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe."  *Franklin*, 503 U.S. at 75.

Plaintiffs invite this Court to extend *Davis* and fashion a rule holding that *Pennhurst*'s notice requirement is inapplicable to Title IX claims that rest on a funding recipient's "[o]fficial policies," which are "always known [and] intended."  Appellants' En Banc Br. at 55; *see also* Menashi, *J.,* Concurrence at 6-7. But to adopt Plaintiffs' argument would run afoul of the very essence of the *Pennhurst* doctrine, and would conflate the requirement that a recipient's actions be *intentional* with the requirement that a recipient have notice of its legal obligations.  Indeed, contrary to Plaintiffs' argument, a Title IX recipient's liability cannot turn solely on the "intentionality" of its challenged action.  Rather, it is intentional action in *clear violation* of Title IX -- that is, *intentional discrimination* -- that removes the *Pennhurst* bar.  *See Franklin*, 503 U.S. at 74-75 ("This notice problem does not arise in a case such as this, in which *intentional discrimination* is alleged.") (emphasis added).  A policy made in good faith and without clear notice that it violates Title IX is unintentional discrimination and cannot be a basis for damages retrospectively, even if it is ultimately deemed to

40

be unlawful. *Gebser*, 524 U.S. at 287 ("[R]elief in an action . . . alleging unintentional discrimination should be prospective only, because where discrimination is unintentional, it is surely not obvious that the grantee was aware that it was administering the program in violation of the condition.") (internal quotation marks and alteration omitted).

*Jackson* is most persuasive on this point. When deciding whether a school district could be held liable for damages under Title IX for retaliating against a teacher who complained about sex discrimination, the *Jackson* Court considered both whether the school district's conduct was intentional, *and* whether Title IX had supplied sufficient notice to the school district that retaliation violates the statute's clear terms. 544 U.S. at 183. The Court proceeded to this second inquiry even after noting that retaliation "is always -- by definition -- intentional." *Id.* If Plaintiffs' view were correct that liability sinks or swims on the sole basis of intentionality, the Court's analysis would have ended there. But it did not. The Court continued to the notice inquiry, considering the statute's text, the 30-year long history of Title IX regulations "clearly prohibit[ing] retaliation," and the courts of appeals decisions that had previously interpreted Title IX to cover retaliation. *Id.* at 183-84. Only then did

the Court determine that, "given this context," the funding recipient "could not have realistically supposed that . . . it remained free to retaliate against those who reported sex discrimination."  *Id.*; *see also Davis*, 526 U.S. at 643-44 (noting first that deliberate indifference to known acts of harassment is intentional conduct and then holding that "the regulatory scheme surrounding Title IX" and the common law have put schools on notice that they may be held responsible for the discriminatory acts of third parties, like student-on-student sex harassment). Therefore, as compared to Plaintiffs' argument that mere promulgation and enforcement of an "official policy" is sufficient, on its own, to hold a funding recipient liable for damages, the more persuasive reading of *Jackson* (and *Davis*) is that damages are barred unless a funding recipient *knew* that its policy *violated* Title IX's clear proscription against sex discrimination.[16]

---

[16]     In his concurrence, our colleague Judge Menashi writes that "three circuits have held, in the Title IX context, that the official acts -- including policies -- of a recipient of federal funds qualify as intentional conduct and are not subject to a further *Pennhurst* notice requirement."  Menashi, *J.*, Concurrence at 10.  The three cases, however, are all factually distinguishable from this case. *See Mansourian*, 602 F.3d at 962 (university eliminated all women from wrestling program and, after students filed complaint with Office of Civil Rights, university agreed to permit women to participate but only on terms that made the women unable to do so); *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1173 (10th Cir. 2007) (two women who were sexually assaulted by university football players and high school students on a recruitment visit were permitted to proceed with Title IX claim where there was evidence that (1) the university had an "official policy" of showing high school football recruits a "good time" on their visits to

Looking to the facts of this case, the notice inquiry necessitates the conclusion that damages are barred. The plain text of Title IX's nondiscrimination mandate does not "unambiguously" prohibit trans-inclusive policies like those adopted by the CIAC; indeed, a substantial body of law suggests that Title IX allows or even requires such policies. *Pennhurst*, 451 U.S. at 17; *see also Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) ("Nowhere does the statute explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity."); *cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020) (applying Title VII's prohibition of discrimination "on the basis of sex" to discrimination based on one's transgender status). Plaintiffs do not dispute that federal guidance on this issue has oscillated between presidential

---

campus, (2) the university failed to provide adequate supervision, and (3) "the likelihood of such misconduct was so obvious that [the university]'s failure was the result of deliberate indifference"); *Pederson v. La. State Univ.*, 213 F.3d 858, 864 (5th Cir. 2000) (female students alleged that LSU violated Title IX by denying them "equal opportunity to participate in intercollegiate athletics, equal opportunity to compete for and to receive athletic scholarships, and equal access to the benefits and services that LSU provides to its varsity intercollegiate athletes, and by discriminating against women in the provision of athletic scholarships and in the compensation [of] paid coaches"). While these cases did involve official acts and policies, these were acts and policies that involved intentional (or deliberately indifferent) discrimination in clear violation of Title IX.

43

administrations and that the Department of Education's Office of Civil Rights

(the "OCR") never clearly provided that allowing transgender students to

participate on athletic teams consistent with their gender identity violates Title

IX. Indeed, counsel for Plaintiffs have acknowledged that conflicting federal

guidance created "confusion" as to what Title IX prohibits when it comes to

transgender athletes, En Banc Transcript at 26, and they have conceded that there

is no case under Title IX, or any other Spending Clause statute, that has

permitted monetary liability to be imposed in the circumstances present here --

that is, where the conduct at issue was approved by the agency responsible for

providing guidance to funding recipients, *id.* at 27.[17]  Nor do Plaintiffs cite a

single court decision that has interpreted Title IX to prohibit trans-inclusive

athletic policies like that of the CIAC.  Indeed, there are cases to the contrary,

holding that trans-exclusionary policies violate Title IX, or that trans-inclusive

---

[17]     *See* Letter from Catherine E. Lhamon, Assistant Sec'y for Civ. Rts., U.S. Dep't of
Educ., and Vanita Gupta, Principal Dep. Assistant Att'y Gen. for Civ. Rts., U.S. Dep't of
Just. (May 13, 2016), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-
title-ix-transgender.pdf ("The Departments treat a student's gender identity as the
student's sex for purposes of Title IX and its implementing regulations.  This means that
a school must not treat a transgender student differently from the way it treats other
students of the same gender identity."); *Soule*, 2021 WL 1617206, at *9 (describing
relevant OCR guidance and concluding that notice was not clear).

policies do not. *See, e.g., Grimm*, 972 F.3d at 619; *Barr*, 949 F.3d at 1227; *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018). The law is far from clear, but, as the majority notes, we need not decide the merits issue, for it is precisely because of this "confusion" and lack of clarity in the law that Defendants did not have notice that the Policy violated Title IX -- even assuming that it does. Hence, Plaintiffs' claim for damages is barred under *Pennhurst*, irrespective of the merits.

## C.

In Part IV of his concurrence, Judge Menashi argues that *Bostock*, a Title VII case, is inapposite because Title IX, in contrast to Title VII, authorizes distinctions among student athletes based on sex. Menashi, *J.*, Concurrence at 15-16. But the fact that, in many circumstances, Title IX contemplates separate high school sports teams for boys and girls tells us nothing about the question before us here: whether Title IX "unambiguously" *requires* schools to *prohibit* transgender students from participating on sports teams aligning with their gender identity. *Pennhurst*, 451 U.S. at 17. If anything, *Bostock*'s holding that Title VII prohibits discrimination against individuals on the basis of their transgender status, *see Bostock*, 140 S. Ct. at 1737, suggests that Title IX, which is

informed by Title VII, may call for inclusion, not exclusion, of transgender individuals.

Judge Menashi writes that in *Bostock* "the Court accepted the premise that 'sex' in Title VII refers "only to biological distinctions between male and female."'" Menashi, *J.*, Concurrence at 14 (quoting *Bostock*, 140 S. Ct. at 1739). But the Court only accepted this proposition for the sake of argument. *See* 140 S. Ct. at 1739 ("because the employees concede the point for argument's sake, we proceed on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female"). Indeed, because the cases before it did not "turn[] on the outcome of the parties' debate," the Court specifically declined to decide whether "the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation." *Id.*; *see also Barr*, 949 F.3d at 1227 ("[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity."). Hence, the question remains open

whether the term "sex" in Title IX and its implementing regulations necessarily means "biological sex."[18]

Judge Menashi also writes that the bathroom cases are irrelevant because "bathrooms are not athletic competitions." Menashi, *J.*, Concurrence at 16. That may be so, but the bathroom cases are indeed relevant because they involve Title IX and, as discussed above, at least some of the decisions have suggested that Title IX allows or even requires trans-inclusive policies. The existing case law -- including the bathroom cases -- did not "unambiguously" tell funding recipients that Title IX was violated by a policy that permits transgender students to compete in gender-specific athletic competitions consistent with their

---

[18]    As the Intervenors note, "Title IX's legislative history repeatedly attributes the lack of equal athletic opportunities, in part, to the socialization of girls and women to conform to sex stereotypes, not just biology." Intervenors' En Banc Br. at 40 (citing *Sex Discrimination Regs. Hearings Before the Subcomm. on Postsecondary Educ. of the Comm. on Educ. & Labor, House of Representatives*, 94th Cong. 189, 197 (1975)) (Statements of Sen. Birch Bayh and Rep. Stewart McKinney). Moreover, the term "biological sex" itself is ambiguous in circumstances in which various biological markers often associated with sex (such as chromosomes, gonads, hormones, and genitals) are not necessarily congruent. *See generally* Katrina Karkazis, *The Misuses of "Biological Sex,"* 394 The Lancet 1898 (2019); *see also Matter of Childers-Gray*, 487 P.3d 96, 120 ¶ 86 (Utah 2021) ("At the very least, 'biological sex' is itself ambiguous and may mean more than the sex designated by examination at birth."). It is unclear whether resolution of these questions is even necessary to the outcome of Plaintiffs' claims. *See* Intervenors' En Banc Br. at 39-42.

gender identity. Defendants did not have clear notice that the Policy violated Title IX -- even assuming it did.

## IV.

"We do not allow plaintiffs to bring suit just because they oppose a policy." *Biden v. Nebraska*, 143 S. Ct. 2355, 2385 (2023) (Kagan, *J.*, dissenting). Yet now that Plaintiffs' core claims for relief have been mooted by the pandemic and their respective graduations, all that is really left is their disagreement with the policy under which they previously competed.

We recognize that civil rights litigants -- and all of us -- are best served when courts are cautious in limiting access to adjudication. But the majority is inadequately cautious about observing the fundamental limitations on this Court's judicial power. In too readily relaxing those limitations, the majority invites courts to become arbiters of abstract social wrongs that they have no real power to redress. The invitation works to undermine, rather than protect, the rights of litigants like Andraya Yearwood and Terry Miller. We respectfully dissent.